# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| WHOLE WOMAN'S HEALTH, on behalf of itself, its staff, physicians, nurses, and patients; ALAMO CITY SURGERY CENTER PLLC d/b/a ALAMO WOMEN'S REPRODUCTIVE SERVICES, on behalf of itself, its staff, physicians, nurses, and patients; BROOKSIDE WOMEN'S MEDICAL CENTER PA d/b/a BROOKSIDE WOMEN'S HEALTH CENTER AND AUSTIN WOMEN'S HEALTH CENTER, on behalf of itself, its staff, physicians, nurses, and patients; HOUSTON WOMEN'S CLINIC, on behalf of itself, its staff, physicians, nurses, and patients; HOUSTON WOMEN'S REPRODUCTIVE SERVICES, on behalf of itself, its staff, physicians, nurses, and patients; PLANNED PARENTHOOD CENTER FOR CHOICE, on behalf of itself, its staff, physicians, nurses, and patients; PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES, on behalf of itself, its staff, physicians, nurses, and patients; PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER, on behalf of itself, its staff, physicians, nurses, and patients; SOUTHWESTERN WOMEN'S SURGERY CENTER, on behalf of itself, its staff, physicians, nurses, and patients; WHOLE WOMAN'S HEALTH ALLIANCE, on behalf of itself, its staff, physicians, nurses, and patients; ALLISON GILBERT, M.D., on behalf of herself and her patients; BHAVIK KUMAR, M.D., on behalf of himself and his patients; THE AFIYA CENTER, on behalf of itself and its staff; FRONTERA FUND, on behalf of itself and its staff; FUND TEXAS CHOICE, on behalf of itself and its staff; JANE'S DUE PROCESS, on behalf of itself and its staff; LILITH FUND, on behalf of itself and its staff; NORTH TEXAS EQUAL ACCESS FUND, on behalf of itself and its staff; REVEREND ERIKA FORBES; REVEREND DANIEL KANTER; and MARVA SADLER, | Civil Action No. 21-cv-616 _____ |

*Plaintiffs*,

v.

AUSTIN REEVE JACKSON, in his official capacity as Judge of the 114th District Court, and on behalf of a class of all Texas judges similarly situated; PENNY CLARKSTON,

in her official capacity as Clerk for the District Court of
Smith County, and on behalf of a class of all Texas court
clerks similarly situated; MARK LEE DICKSON;
STEPHEN BRINT CARLTON, in his official capacity as
Executive Director of the Texas Medical Board;
KATHERINE A. THOMAS, in her official capacity as
Executive Director of the Texas Board of Nursing; CECILE
ERWIN YOUNG, in her official capacity as Executive
Commissioner of the Texas Health and Human Services
Commission; ALLISON VORDENBAUMEN BENZ, in her
official capacity as Executive Director of the Texas Board
of Pharmacy; and KEN PAXTON, in his official capacity as
Attorney General of Texas,

     *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF — CLASS ACTION

### INTRODUCTION

1.    The Texas Legislature's well-documented hostility to the rights of pregnant people has gone to a new extreme. This lawsuit is brought under 42 U.S.C. § 1983 to challenge Texas Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021) ("S.B. 8" or "the Act"), which flagrantly violates the constitutional rights of Texans seeking abortion and upends the rule of law in service of an anti-abortion agenda. If this attempt to strip Texans of their federal constitutional rights is not blocked, then any state could similarly subvert the federal constitutional rights of a group disfavored in that state.  For this and many other reasons, S.B. 8 must be declared unconstitutional and enjoined.

2.    S.B. 8 bans abortion at approximately six weeks in pregnancy, a point before many people even know they are pregnant and roughly four months before viability. A copy of S.B. 8, which is set to take effect on September 1, 2021, is attached as Exhibit 1.

3.    In this respect, S.B. 8 is like other pre-viability abortion bans that states have adopted in defiance of *Roe v. Wade*, 410 U.S. 113 (1973), and nearly fifty years of unbroken

precedent. That precedent plainly holds that a state may not prohibit abortion before viability; until that time, it is for the patient—not the state—to decide whether to continue a pregnancy. Accordingly, when confronted with the merits of these abortion bans, courts have uniformly invalidated every state law banning abortion at a point before viability.

4.      The Texas Legislature was well aware that S.B. 8 would stand no chance of taking effect if a court reviewed it in advance of the law's September 1 effective date. So the Legislature attempted to insulate its patently unconstitutional law from judicial review. S.B. 8 purports to bar government defendants—such as the attorney general, local prosecutors, and the health department—from directly enforcing the law's terms. Instead, the Act deputizes private citizens to enforce the law, allowing "any person" *other than government officials* to bring a civil lawsuit against anyone who provides an abortion in violation of the Act, "aids or abets" such an abortion, or intends to do these things. These civil suits are permitted regardless of whether the person suing has any connection to the abortion.

5.      If a claimant in an S.B. 8 case prevails, they are entitled to (1) "injunctive relief sufficient to prevent" future violations; (2) without any showing of harm, an award of "statutory damages" of *at least* $10,000 per abortion, with no apparent maximum amount; and (3) their costs and attorney's fees. In effect, S.B. 8 places a bounty on people who provide or aid abortions, inviting random strangers to sue them.

6.      The transparent purpose of S.B. 8's enforcement scheme was to make it so that abortion providers and people who assist abortions could not sue government officials for an injunction to block the law before it takes effect. As the legislative director for Texas Right to Life (the largest anti-abortion organization in the state) explained during the legislative proceedings, every six-week ban on abortion adopted by other states "has been enjoined or had at least some

3

negative court action," and "it's because of the [government] enforcement mechanism[]" provided for in those laws.[1] He later added that some people in the anti-abortion movement thought that the approach taken by other states "was not working in federal court, so let's try a different route."[2] In adopting S.B. 8, the Legislature believed that it could be the exception to the rule by setting vigilantes loose to enforce its unconstitutional abortion ban.

7.      S.B. 8 also commandeers the state's courts to help enforce the ban. At every turn, S.B. 8 purports to replace normal civil-litigation rules and clearly established federal constitutional rules with distorted versions designed to maximize the abusive and harassing nature of the lawsuits and to make them impossible to fairly defend against. For example, S.B. 8 provides that persons sued under the Act could be forced into any of Texas's 254 counties to defend themselves, so long as at least one vigilante there is willing to bring suit, and it prohibits transfer of the cases to any other venue without the parties' joint agreement. S.B. 8 also states that a person sued under the Act may not point to the fact that the claimant already lost an S.B. 8 lawsuit against someone else on equally applicable grounds or that a court order permitted an abortion provider's conduct at the time when it occurred, if that court order was later overruled.

8.      If not blocked, S.B. 8 will force abortion providers and others who are sued to spend massive amounts of time and money to defend themselves in lawsuits across the state in which the deck is heavily stacked against them. Even if abortion providers and others sued in S.B. 8 lawsuits ultimately prevail in them—as they should in every case if only they could mount a fair defense— the lawsuits against them will still have accomplished S.B. 8's goal of harassment. The suits may

---

[1] Hr'g on S.B. 8 Before the S. Comm. on State Affairs, 87th Leg., Reg. Sess., video at 7:30–45 (Tex. 2021) (statement of John Seago, Leg. Dir. of Tex. Right to Life), *available at* https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15469.

[2] *Citizens, Not the State, Will Enforce New Abortion Law in Texas*, NYTimes.com (July 9, 2021), https://www.nytimes.com/2021/07/09/us/abortion-law-regulations-texas.html.

also bankrupt those who are sued in the process, since S.B. 8 states they cannot recover their attorney's fees and costs against the vigilante.

9.      But because S.B. 8 does not, in fact, permit a fair defense, abortion providers and others targeted by the law must also weigh the risk of ruinous liability and injunctions if they provide services banned by S.B. 8, get sued, and lose in any one of Texas's state courts.

10.     Other aspects of S.B. 8 are likewise targeted to chill the exercise of constitutional rights while systematically isolating abortion patients. Unlike typical aiding-and-abetting provisions, S.B. 8 targets those it describes as aiders or abettors even if they did not know or have any reason to know that the abortion they assisted would be deemed unlawful under S.B. 8. A person weighing whether their activity might prompt a costly S.B. 8 lawsuit for aiding and abetting must also consider the fact that the law invites enforcement by *anyone*, no matter how hostile and untrained in the law. As a result, someone who accompanies her sister to an abortion clinic and pays for the abortion, or a sexual assault counselor who calls an abortion clinic on behalf of a patient, could find themselves dragged into a court across the state. And although abortion patients cannot be sued under S.B. 8, the law provides any abusive partner, controlling parent, or disapproving neighbor with a ready tool to go after the patient's doctor for a court order to block that patient's abortion choice.

11.     Separate from the six-week abortion ban and its enforcement mechanism, S.B. 8 also imposes a draconian one-way fee-shifting penalty that is designed to deter *any* challenges, including meritorious challenges, to state and local abortion restrictions in Texas, not just challenges to S.B. 8. Under this deterrence provision, civil-rights plaintiffs who challenge any Texas abortion restriction can be held liable for their opponents' attorney's fees and costs unless they sweep the table by prevailing on every single claim they bring. Parties that defend abortion

restrictions could recover fees, for example, if a court dismisses an abortion provider's claim as moot, or rejects one of two claims pleaded in the alternative, and they could do so even if the challenged abortion restriction was ultimately declared unconstitutional and enjoined. This new fee-shifting provision purports to apply to civil-rights challenges brought in both federal and state court and to any causes of action, including to Section 1983 claims that are already subject to a comprehensive—and diametrically opposed—fee-shifting regime.

12.    To further take aim at civil-rights plaintiffs, even attorneys and law firms who represent challengers to abortion restrictions can be held jointly and severally liable for the opponent's attorney's fees and costs. If enforceable, S.B. 8 could therefore subject one-person firms or pro bono counsel to millions of dollars in liability just for making well-founded but ultimately unsuccessful claims on behalf of a client.

13.    As with the six-week ban, S.B. 8 attempts to ensure that state-court proceedings to obtain attorney's fees under this new provision would be hopelessly stacked against abortion providers and others who attempt to vindicate constitutional rights. S.B. 8 provides that the person sued for attorney's fees would be barred from defending on the ground that an earlier court, including a federal district court in the underlying case, refused to award fees to the claimant, or held the fee penalty unconstitutional.

14.    If permitted to take effect, S.B. 8 will create absolute chaos in Texas and irreparably harm Texans in need of abortion services. In particular, the burdens of this cruel law will fall most heavily on Black, Latinx, and indigenous patients who, because of systemic racism, already encounter substantial barriers to obtaining health care, and will face particular challenges and injuries if forced to attempt to seek care out of state or else carry an unwanted pregnancy to term. S.B. 8 will also cause irreparable harm to Plaintiffs, who are Texas abortion providers and

individuals and organizations who help patients obtain abortions. Accordingly, Plaintiffs bring this action to challenge S.B. 8 on behalf of themselves; their staff, including physicians, physician assistants, nurses, and pharmacists; and their patients.

15.     Plaintiffs bring claims challenging the six-week ban and its enforcement scheme against a putative class of Texas state-court judges who will be called upon to enforce S.B. 8's terms; a putative class of Texas court clerks who will participate in the enforcement scheme by, at a minimum, accepting S.B. 8 enforcement actions for filing and issuing service of process; Mark Lee Dickson, a private individual deputized to bring S.B. 8 enforcement claims under color of state law, from whom Plaintiffs face a credible threat of enforcement; and state officials who, despite S.B. 8's enforcement restrictions, still have the power to apply S.B. 8 when enforcing other laws against Plaintiffs, including through disciplinary proceedings.

16.     Plaintiffs also challenge S.B. 8's new fee-shifting penalty for challenges to abortion restrictions. Plaintiffs bring claims against the Attorney General and other state officials who have regularly defended and will continue to defend Texas's abortion restrictions in court and who would be permitted under S.B. 8 to recoup attorney's fees and costs.

17.     At bottom, the question in this case is whether Texas may adopt a law that sets about to "do precisely that which the [Constitution] forbids." *Terry v. Adams*, 345 U.S. 461, 469–70 (1953) (striking down a Texas law attempting to insulate white-only political primaries from federal court review).

18.     The answer to that question must be no. Otherwise, states and localities across the country would have free rein to target federal rights they disfavor. Today it is abortion providers and those who assist them; tomorrow it might be gun buyers who face liability for every purchase. Churches could be hauled into far-flung courts to defend their religious practices because someone

somewhere disagrees with them. Same-sex couples could be sued by neighbors for obtaining a marriage license. And Black families could face lawsuits for enrolling their children in public schools. It is not hard to imagine how states and municipalities bent on defying federal law and the federal judiciary could override constitutional rights if S.B. 8 is permitted to take effect.

19.     Plaintiffs urgently need this Court to put a stop to Texas's brazen defiance of the rule of law and the federal constitutional rights to which Texans are entitled.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. This is a civil and constitutional rights action arising under 42 U.S.C. § 1983 and the United States Constitution.

21.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of the Court, including the Court's inherent authority to enforce the supremacy of federal law as against contrary state law.

22.     Venue is appropriate in this district under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

23.     This case is appropriately filed in the Austin Division because Defendants include the Executive Director of the Texas Medical Board, the Executive Director of the Texas Board of Nursing, the Executive Commissioner of the Texas Health and Human Services Commission, the Executive Director of the Texas Board of Pharmacy, and the Attorney General of Texas, all of whom maintain offices in this division. Assignment to the Austin Division is also proper because several Plaintiffs operate health centers in Austin that provide abortions banned by S.B. 8 and

serve abortion patients who reside in the Austin Division and whose rights are violated by the challenged law.

## PLAINTIFFS

24.     Plaintiff Whole Woman's Health operates licensed abortion facilities in Fort Worth, McAllen, and McKinney. Whole Woman's Health provides a range of reproductive health services, including medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Whole Woman's Health sues on behalf of itself and its physicians, nurses, other staff, and patients.

25.     Plaintiff Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services ("Alamo") operates a licensed ambulatory surgical center in San Antonio. Alamo provides a range of reproductive health services, including medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Alamo sues on behalf of itself and its physicians, nurses, pharmacists, other staff, and patients.

26.     Plaintiff Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center ("Austin Women's") operates a licensed abortion facility in Austin. Austin Women's provides a range of reproductive health services, including medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Austin Women's sues on behalf of itself and its physicians, nurses, other staff, and patients.

27.     Plaintiff Houston Women's Clinic provides medication and procedural abortions and contraceptive care at its licensed abortion facility in Houston. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be

detected. Houston Women's Clinic sues on behalf of itself and its physician, nurses, other staff, and patients.

28.     Plaintiff Houston Women's Reproductive Services ("HWRS") operates a licensed abortion facility in Houston. HWRS provides medication abortion services. The majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. HWRS sues on behalf of itself and its physicians, nurses, other staff, and patients.

29.     Plaintiff Planned Parenthood of Greater Texas Surgical Health Services ("PPGT Surgical Health Services") is a Texas not-for-profit corporation headquartered in Dallas. It operates licensed ambulatory surgical centers in Austin, Dallas, and Fort Worth, and licensed abortion facilities in El Paso, Lubbock, and Waco.[3] PPGT Surgical Health Services provides a range of reproductive health services, including medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. PPGT Surgical Health Services sues on behalf of itself and its physicians, nurses, pharmacists, other staff, and patients.

30.     Plaintiff Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), is a not-for-profit corporation headquartered in San Antonio. It operates a licensed ambulatory surgical center and two licensed abortion facilities in San Antonio. PPST Surgical Center provides a range of reproductive health services, including medication and procedural

---

[3] The City of Lubbock recently passed an ordinance prohibiting all abortions in the municipality. That ban is subject to an ongoing legal challenge, and in the meantime, the Lubbock abortion facility is not currently providing abortion. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 2385110 (N.D. Tex. June 1, 2021) (dismissing case for lack of jurisdiction), *mot. for reconsideration filed* (N.D. Tex. June 29, 2021), ECF No. 51.

abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. PPST Surgical Center sues on behalf of itself and its physicians, nurses, pharmacists, other staff, and patients.

31.     Plaintiff Planned Parenthood Center for Choice ("PP Houston"), is a Texas not-for-profit corporation headquartered in Houston. It operates a licensed ambulatory surgical center in Houston and a licensed abortion facility in Stafford. PP Houston provides a range of reproductive health services, including medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. PP Houston sues on behalf of itself and its physicians, nurses, pharmacists, other staff, and patients.

32.     Plaintiff Southwestern Women's Surgery Center ("Southwestern") operates a licensed ambulatory surgical center in Dallas. Southwestern provides a range of reproductive health services, including medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Southwestern sues on behalf of itself and its physicians, nurses, pharmacists, other staff, and patients.

33.     Plaintiff Whole Woman's Health Alliance is a Texas not-for-profit corporation. It operates a licensed abortion facility in Austin that provides both medication and procedural abortions. The vast majority of abortions that it provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Whole Woman's Health Alliance sues on behalf of itself and its physicians, nurses, other staff, and patients.

34.     Plaintiff Allison Gilbert, M.D., is a board-certified obstetrician-gynecologist who is licensed to practice medicine in Texas. She serves as a physician and Co-Medical Director at

Southwestern, where she provides medication and procedural abortions. The vast majority of abortions that Dr. Gilbert provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. She sues on behalf of herself and her patients.

35.     Plaintiff Bhavik Kumar, M.D., is a board-certified family medicine physician who is licensed to practice medicine in Texas. He serves as a physician at PP Houston, where he provides medication and procedural abortions. The vast majority of abortions that Dr. Kumar provides occur at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. He sues on behalf of himself and his patients.

36.     Plaintiffs Whole Woman's Health, Alamo, Austin Women's, Houston Women's Clinic, HWRS, PPGT Surgical Health Services, PPST Surgical Center, PP Houston, Southwestern, Whole Woman's Health Alliance, and Drs. Allison Gilbert and Bhavik Kumar are hereinafter referred to as the "Provider Plaintiffs" because each provides abortions in Texas that will be prohibited by S.B. 8 on September 1 absent this Court's relief.

37.     Plaintiff The Afiya Center is a nonprofit organization incorporated in Texas and based in Dallas. Its mission is to serve Black women and girls by transforming their relationship with their sexual and reproductive health by addressing the consequences of reproductive oppression. The Afiya Center provides financial, practical, and emotional support for abortion patients and advocates for abortion access. Almost all its clients are at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. The Afiya Center sues on behalf of itself and its clients.

38.     Plaintiff Frontera Fund is a nonprofit organization incorporated in Texas. Its mission is to make abortion accessible in the Rio Grande Valley by providing support for abortion patients regardless of their background and to shift the shame and stigma surrounding abortion

through grassroots organizing. Frontera Fund provides financial, practical, and logistical support for low-income abortion patients. Almost all its clients are at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Frontera Fund sues on behalf of itself and its clients.

39.     Plaintiff Fund Texas Choice is a nonprofit organization incorporated in Texas. Its mission is to help Texans equitably access abortion through safe, confidential, and comprehensive practical support. Fund Texas Choice provides practical and logistical support for abortion patients throughout the state. Almost all its clients are at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Fund Texas Choice sues on behalf of itself and its clients.

40.     Plaintiff Jane's Due Process is a nonprofit organization incorporated in Texas and based in Austin. Its mission is to help ensure that young people in Texas have full reproductive freedom and autonomy over their healthcare decisions. Jane's Due Process helps young people navigate parental-consent laws and confidentially access abortion care in Texas through practical support, financial assistance, and education. Almost all its clients are at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Jane's Due Process sues on behalf of itself and its clients.

41.     Plaintiff Lilith Fund for Reproductive Equity ("Lilith Fund") is a nonprofit organization incorporated in Texas. Its mission is to provide financial assistance and emotional support for people needing abortions in Texas, foster a positive culture around abortion, and fight for reproductive justice across the state. Lilith Fund provides financial, emotional, and case-management support primarily for abortion patients living in central and southeast Texas. Almost all its clients are at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. Lilith Fund sues on behalf of itself and its clients.

42.     Plaintiff North Texas Equal Access Fund ("TEA Fund") is a nonprofit organization incorporated in Texas and based in Dallas. Its mission is to foster reproductive justice. TEA Fund provides financial, emotional, and logistical support for low-income abortion patients in northern Texas. Almost all its clients are at a point in pregnancy when a "fetal heartbeat," as defined in S.B. 8, can be detected. TEA Fund sues on behalf of itself and its clients.

43.     Plaintiff Marva Sadler is the Senior Director of Clinical Services with Whole Woman's Health and Whole Woman's Health Alliance. Ms. Sadler oversees clinical operations for those entities' Texas clinics and is personally involved in many aspects of patient care.

44.      Plaintiff Reverend Daniel Kanter is an ordained minister who serves as CEO and Senior Minister of First Unitarian Church in Dallas. He provides pastoral care and confidential counseling to pregnant people and their families as they make decisions about abortions. Reverend Kanter also leads the Chaplaincy Program at Southwestern, through which he provides individual counseling as well as spiritual guidance to clinic patients and their families during their appointments.

45.     Plaintiff Reverend Erika Forbes is a licensed, ordained minister and trained spiritual counselor in Dallas. Through her private spiritual counseling practice, she provides religious guidance and spiritual support for pregnant people who are considering abortion.

46.     The Afiya Center, Frontera Fund, Fund Texas Choice, Jane's Due Process, Lilith Fund, TEA Fund, Ms. Sadler, Rev. Kanter, and Rev. Forbes are hereinafter referred to as the "Advocate Plaintiffs" because they advocate for abortion patients through activities that may be alleged to aid and abet abortions prohibited by the Act and face a credible threat of enforcement on that ground.

47.     Plaintiffs are frequently forced to bring Section 1983 suits to challenge abortion restrictions and similar laws and in some cases do not prevail on all claims. In addition to this case, they collectively have three Section 1983 cases pending in federal court that challenge abortion restrictions. *See Whole Woman's Health v. Paxton*, 978 F.3d 974 (5th Cir. 2020) (mem.) (en banc) (including Defendant Paxton); *Whole Woman's Health v. Smith*, 338 F. Supp. 3d 606 (W.D. Tex. 2018) (including the Commissioner of the Texas Health and Human Services Commission), *appeal filed*, No. 18-50730 (5th Cir. Sept. 7, 2018); *PPGTSHS v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 2385110 (N.D. Tex. June 1, 2021) (dismissing case for lack of jurisdiction), *mot. for reconsideration filed* (N.D. Tex. June 29, 2021), ECF No. 51. Plaintiffs have frequently been forced to protect their interests in other litigation, including state-court litigation, as well. *See, e.g.*, *Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) (mem.) (vacating decisions regarding Covid-related abortion ban after challenged executive order expired) (including the Attorney General and Texas licensing authorities as defendants).

## DEFENDANTS

48.     Defendant Hon. Austin Reeve Jackson is Judge of the 114th District Court, a court with jurisdiction over S.B. 8 claims. He is sued in his official capacity and as a representative of a putative class of all judges in the State of Texas with jurisdiction over the civil actions created by S.B. 8.  He may be served with process at the Smith County Courthouse, 100 N. Broadway, Room 209, Tyler, TX 75702.

49.     Defendant Penny Clarkston is the Clerk for the District Court of Smith County, and in that role is charged with accepting civil cases for filing and issuing citations for service of process upon the filing of a civil lawsuit. She is served in her official capacity and as a representative of a putative class of all court clerks in the State of Texas for courts with jurisdiction

over the civil actions created by the Act. She may be served with process at the Smith County Courthouse, 100 N. Broadway, Room 204, Tyler, TX 75702.

50. Defendant Mark Lee Dickson is a resident of Longview, Texas. He serves as the Director of Right to Life East Texas and has pushed for the adoption of state and local laws that impose liability on abortion providers and individuals who assist in the provision or obtainment of constitutionally protected abortion. Mr. Dickson has been deputized to seek enforcement of S.B. 8 against Plaintiffs for providing prohibited abortions, aiding and abetting such abortions, or intending to do these things. Plaintiffs face a credible threat that he will sue them under S.B. 8 if they perform or assist in the performance of abortions prohibited by the Act.[4] Mr. Dickson is properly sued under Section 1983 as acting under color of state law. He may be served with process at 233 E. George Richey Road, Longview, TX 75604-7622.

51. Defendant Stephen Brint Carlton is the Executive Director of the Texas Medical Board ("TMB") and in that capacity serves as the chief executive and administrative officer of TMB. Tex. Occ. Code § 152.051. TMB must initiate disciplinary action against licensees who violate any provision of Chapter 171 of the Texas Health and Safety Code. *Id.* § 165.001; *id.* § 164.055. Section 3 of S.B. 8, which includes the six-week ban and enforcement provisions, and

---

[4] *See, e.g.*, Mark Lee Dickson, Facebook (June 1, 2021, 7:45 AM), https://www.facebook.com/markleedickson/posts/10159259037629866 ("If abortions do end up being performed this week or next week or any week thereafter, I will be suing Planned Parenthood for the murder of unborn children under the provisions allowed in the Lubbock Ordinance Outlawing Abortion."); Mark Lee Dickson, Facebook (Mar. 29, 2021, 11:15 PM), https://www.facebook.com/markleedickson/posts/10159115346774866 ("[B]ecause of [SB 8] you will be able to bring many lawsuits later this year against any abortionists who are in violation of this bill. Let me know if you are looking for an attorney to represent you if you choose to do so. Will be glad to recommend some."); Mark Lee Dickson, Facebook (June 1, 2:07 PM), https://www.facebook.com/markleedickson/videos/10159259661094866 (posting a video of himself and another individual calling Planned Parenthood's Lubbock health center to test whether the center would schedule an abortion despite the City ban).

Section 7 of S.B. 8, will be codified in that chapter. TMB may impose discipline on a doctor who violates any state law "connected with the physician's practice of medicine" because such violation constitutes per se "unprofessional or dishonorable conduct." Tex. Occ. Code § 164.053(a)(1); *id.* § 164.052(a)(5); *see also* § 164.053(b) (making clear that "[p]roof of the commission of the act while in the practice of medicine . . . is sufficient" for discipline). TMB must also investigate and review the "medical competency" of licensees who have been named in three or more health-care-related lawsuits within a five-year period. 22 Tex. Admin. Code § 176.8. Mr. Carlton has been named by Plaintiffs as a defendant in previous litigation challenging abortion restrictions or regulations and will likely continue to be named in such suits given the nature of his duties. S.B. 8, therefore, authorizes him to seek attorney's fees and costs from Plaintiffs for any covered claim they bring in this litigation and in other suits, if judgment on any claim is entered in his favor or dismissed, regardless of reason. S.B. 8 § 4 (to be codified at Tex. Civ. Prac. & Rem. Code § 30.022) (hereinafter S.B. 8 § 4 citations are to the newly created sections of Tex. Civ. Prac. & Rem. Code only). Mr. Carlton is sued in his official capacity and may be served with process at 333 Guadalupe, Tower 3, Suite 610, Austin, TX 78701.

52.     Defendant Katherine A. Thomas is the Executive Director of the Texas Board of Nursing ("TBN"). Ms. Thomas performs duties as required by the Nursing Practice Act and as designated by the board. Tex. Occ. Code § 301.101. TBN is authorized to take disciplinary, administrative, and civil action against licensed nurses who violate the Nursing Practice Act or its rules. *Id.* §§ 301.452(b)(1), 301.501, 301.553. Under TBN's rules, a nurse must "conform to . . . all federal, state, or local laws, rules or regulations affecting the nurse's current area of nursing practice." 22 Tex. Admin. Code § 217.11(1)(A). A nurse's "repeated[] fail[ure] . . . to perform" nursing duties "in conformity with th[is] standard[]" constitutes a per se "[u]nsafe [p]ractice" for

17

which discipline may be imposed. *Id.* § 217.12(1)(A). Ms. Thomas has been named by Plaintiffs as a defendant in previous litigation challenging abortion restrictions or regulations and will likely continue to be named in such suits given the nature of her duties. S.B. 8 thus authorizes her to seek attorney's fees and costs from Plaintiffs for any covered claim they bring in this litigation and in other suits, if judgment is entered on any claim in her favor or dismissed, regardless of reason. S.B. 8 § 30.022. Ms. Thomas is sued in her official capacity and may be served with process at 333 Guadalupe, Suite 3-460, Austin, TX 78701-3944.

53.     Defendant Cecile Erwin Young is the Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). HHSC licenses and regulates abortion facilities and ambulatory surgical centers ("ASCs") operated by Plaintiffs. Tex. Health & Safety Code §§ 243.011, 245.012. HHSC is also charged with enforcing Chapter 171 of the Texas Health and Safety Code, *id.* § 171.005, including amendments made by § 7 of S.B. 8. Its regulations further provide that it may take disciplinary or civil action against any licensed facility that violates Chapter 171, where S.B. 8 § 3 and § 7 will be codified, or that fails to ensure physicians working in the facility comply with the Medical Practice Act. *See* 25 Tex. Admin. Code § 139.60(c), (*l*); Tex. Health & Safety Code §§ 243.014-.015, 245.015, 245.017; *see also* 25 Tex. Admin. Code § 135.4(*l*) (requiring abortion-providing ASCs to comply with rules for abortion facilities). HHSC may deny, suspend, or revoke a license and assess civil and administrative financial penalties against a licensed abortion facility or ASC for violating its rules. Tex. Health & Safety Code §§ 243.014-.015, 245.015, 245.017. Ms. Young's predecessor overseeing abortion facilities and ASCs has been named by Plaintiffs as a defendant in previous litigation challenging abortion restrictions or regulations, and Ms. Young will likely continue to be named in such suits given the nature of her duties. S.B. 8 authorizes her to seek attorney's fees and costs from Plaintiffs for any

covered claim they bring in this litigation and in other suits, if judgment is entered on any claim in her favor or dismissed, regardless of reason. S.B. 8 § 30.022. She is sued in her official capacity and may be served with process at 4900 N. Lamar Blvd., Austin, TX 78751.

54.     Defendant Allison Vordenbaumen Benz is the Executive Director of the Texas Board of Pharmacy ("TBP"). As Executive Director, Ms. Benz performs duties as required by the Texas Pharmacy Act or designated by the board. Tex. Occ. Code § 553.003. TBP is authorized to take disciplinary, administrative, and civil action against licensed pharmacists and pharmacies who have violated the Texas Pharmacy Act or its rules, including for "unprofessional" conduct or "gross immorality." *Id.* §§ 565.001(a), 565.002. TBP defines "unprofessional conduct" to include "engaging in behavior or committing an act that fails to conform with the standards of the pharmacy profession, including, but not limited to, criminal activity." 22 Tex. Admin. Code § 281.7(a). "[G]ross immorality" includes broadly defined types of misconduct that are "willful" and "flagrant." *Id.* § 287.1(b). The Board of Pharmacy may assess a civil or administrative financial penalty for any violation of the Pharmacy Act or its rules. Tex. Occ. Code §§ 566.001-.002, 566.101. S.B. 8 authorizes Ms. Benz to seek attorney's fees and costs from Plaintiffs for any covered claim they bring in this litigation if judgment is entered in her favor or dismissed, regardless of reason. S.B. 8 § 30.022. She is sued in her official capacity and may be served with process at 333 Guadalupe, Suite 500, Austin, TX 78701-3944.

55.     Defendant Ken Paxton is the Attorney General of Texas. He is empowered to institute an action for a civil penalty against physicians and physician assistants licensed in Texas who are in violation of or threatening to violate any provision of the Medical Practice Act, including provisions triggered by a violation of S.B. 8. Tex. Occ. Code § 165.101. Mr. Paxton has been named by Plaintiffs as a defendant in previous litigation challenging abortion restrictions or

19

regulations and will likely continue to be named in such suits given the nature of his duties. S.B. 8 authorizes him to seek attorney's fees and costs from Plaintiffs for any covered claim they bring in this litigation and in other suits, if judgment is entered on any claim in his favor or dismissed, regardless of reason. S.B. 8 § 30.022. He is sued in his official capacity and may be served with process at 300 West 15th Street, Austin, Texas 78701.[5]

56.     Defendants Carlton, Thomas, Young, Benz, and Paxton are hereinafter referred to collectively as "the Government Official Defendants."

## FACTUAL ALLEGATIONS

## I.     ABORTION IN THE UNITED STATES

57.     Legal abortion is one of the safest medical procedures in the United States. A woman's risk of death associated with carrying a pregnancy to term is approximately 14 times higher than that associated with abortion, and every pregnancy-related complication is more common among women giving birth than among those having abortions.[6]

58.     Abortion is also very common: approximately one in four women in the United States has an abortion by age forty-five.

---

[5] Defendant Paxton is a proper defendant under Section 1983 and *Ex Parte Young*, 209 U.S. 123 (1908), based on his authority to enforce collateral statutes in response to S.B. 8 violations and to seek costs and fees under S.B. 8 Section 4. Plaintiffs further allege that they would have standing to sue Defendant Paxton and that he would be a proper defendant even in the absence of that collateral enforcement authority and Section 4's fee-shifting provision. Plaintiffs recognize that this standing theory is currently foreclosed by the Fifth Circuit's decision in *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), but assert it here to preserve it for any appeal.

[6] References to "woman" or "women" are meant as shorthand for people who are or may become pregnant. However, people with other gender identities, including transgender men and gender-diverse individuals, may also become pregnant and seek abortion services. *Accord Reprod. Health Servs. v. Strange*, No. 17-13561, 2021 WL 2678574, at *1 n.2 (11th Cir. June 30, 2021) ("Although this opinion uses gendered terms, we recognize that not all persons who may become pregnant identify as female.")

59.     Those seeking an abortion do so for a variety of deeply personal reasons, including familial, medical, and financial ones. Deciding whether to keep or end a pregnancy implicates a person's core religious beliefs, values, and family circumstances. Some people have abortions because it is not the right time to have a child or to add to their families—a majority of abortion patients already have at least one child. Some want to pursue their education; some lack the economic resources or level of partner support or stability needed to raise children; some will be unable to care adequately for their existing children or their ill or aging parents if they increase their family size. Others end a pregnancy to be able to leave an abusive partner. Some people seek abortions to preserve their life or health or because of a diagnosed fetal medical condition; some because they have become pregnant as a result of rape or incest; and others because they decide not to have children at all. Some families feel they do not have the societal or personal resources—financial, medical, educational, or emotional—to care for a child with physical or intellectual disabilities, or to do so and simultaneously provide for their existing children.

## II.     STATUTORY FRAMEWORK OF S.B. 8

### A.     S.B. 8, Section 3: The Six-Week Ban and Enforcement Actions

#### (i)     *The prohibition on performing abortions*

60.     Section 3 of S.B. 8 requires physicians who perform abortions in Texas to first determine whether "a detectable fetal heartbeat" is present. S.B. 8 § 3 (to be codified at Tex. Health & Safety Code § 171.203(b)); *see id.* (to be codified at Tex. Health & Safety Code § 171.201(1)) (hereinafter S.B. 8 § 3 citations are to newly created sections of Tex. Health & Safety Code only). The Act prohibits the physician from providing an abortion after "detect[ing] a fetal heartbeat" or if the physician "failed to perform a test to detect a fetal heartbeat." *Id.* § 171.204(a). S.B. 8 contains no exception for pregnancies that result from rape or incest, or for fetal health conditions that are incompatible with sustained life after birth. The only exception is for a medical emergency.

21

*Id.* §§ 171.204(a), 171.205(a). Sections 7 and 9 of S.B. 8 impose additional reporting requirements on abortions performed because of a medical emergency. S.B. 8 § 7 (to be codified at Tex. Health & Safety Code § 171.008); S.B. 8 § 9 (to be codified at Tex. Health & Safety Code § 245.011(c)).

61.     S.B. 8 defines "fetal heartbeat" as "cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac." S.B. 8 § 171.201(1). In a typically developing pregnancy, ultrasound can generally detect cardiac activity beginning at approximately six weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("LMP").

62.     S.B. 8 thus prohibits virtually all abortions after approximately six weeks LMP—before many patients even know they are pregnant. Indeed, for patients with regular menstrual periods, six weeks of pregnancy is only two weeks after the patient's first missed period.

63.     A full-term pregnancy is approximately 40 weeks LMP.

64.     The cells that produce early cardiac activity described in S.B. 8 have not yet formed a "heart." The term "heartbeat" in S.B. 8 thus covers not just a "heartbeat" in the lay sense, but also early cardiac activity—more accurately, electrical impulses—present before full development of the cardiovascular system. Similarly, a developing pregnancy is properly referred to as an "embryo" until approximately ten weeks LMP, when it becomes a "fetus." So, despite S.B. 8's use of the phrase "*fetal* heartbeat," the Act forbids abortion even when cardiac activity is detected in an embryo. *See id.* §§ 171.201(1), 171.201(7), 171.204(a) (emphasis added). Because neither "fetal" nor "heartbeat" is accurate medical terminology at this stage of pregnancy, Plaintiffs refer to the prohibition against providing an abortion after the detection of a "fetal heartbeat" as a "six-week ban."

65.     No embryo is viable at six weeks LMP, or at any other point when cardiac activity can first be detected by ultrasound. Instead, viability is generally understood as the point in pregnancy when a fetus, if born at that time, has a reasonable likelihood of sustained life after birth, with or without artificial support.

66.     Viability generally does not occur until approximately 24 weeks LMP. By prohibiting abortion after approximately 6 weeks LMP, S.B. 8 bans abortion roughly *four months* before viability.

67.     Although patients generally obtain an abortion as soon as they can, the overwhelming majority of abortions in Texas occur after six weeks of pregnancy. Many patients do not even realize they are pregnant before six weeks LMP—for instance, because they have irregular menstrual periods, or because they mistake the vaginal bleeding that is common in early pregnancy for a period.

68.     Even those patients who do confirm a pregnancy before 6 weeks LMP and decide quickly that they want an abortion often encounter substantial barriers to obtaining one. They must navigate Texas's onerous legal scheme for abortion, which requires, *inter alia*, that all patients living within 100 miles of an abortion clinic travel to the clinic and obtain an ultrasound at least 24 hours before the abortion, Tex. Health & Safety Code §§ 171.011-.016, and that patients under eighteen obtain written parental authorization or a court order before obtaining care, Tex. Fam. Code §§ 33.001-.014.

69.     Access to care in Texas has been decimated by years of unnecessary and burdensome restrictions. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313 (2016) (unconstitutional abortion restriction "led to the closure of half of Texas' clinics, or thereabouts").

70. Financial and logistical difficulties also prevent many patients from obtaining an abortion before six weeks LMP. Nationwide, three out of four abortion patients are poor or have low incomes. Such patients are often delayed in accessing abortions as they struggle to raise funds to cover the cost of the abortion, childcare (for the majority of abortion patients who already have at least one child), transportation to and from the clinic, any needed hotel rooms for patients forced to travel long distances to the nearest provider, and lost wages for missed work.

71. With very narrow exceptions, Texas bars coverage of abortion through its Medicaid program, 1 Tex. Admin. Code § 354.1167, health plans offered in the state health-insurance exchange, Tex. Ins. Code § 1696.002, and private insurance plans, *id.* § 1218.001-.006, compounding the financial hurdles patients face in attempting to access abortion services.

72. Additionally, patients whose pregnancies are the result of sexual assault or who are experiencing intimate partner violence may be delayed because of ongoing physical or emotional trauma, or because of the need to keep their pregnancy and abortion decision private from an abusive partner.

      **(ii)**    ***Liability for providing prohibited abortions, aiding and abetting prohibited abortions, or intending to provide or aid and abet such abortions***

73. S.B. 8 creates liability for "perform[ing] or induc[ing] an abortion in violation of" the six-week ban. S.B. 8 § 171.208(a)(1).

74. S.B. 8 also creates liability for "knowingly engag[ing] in conduct that aids or abets the performance or inducement of" an abortion that violates the six-week ban. *Id.* § 171.208(a)(2). Although S.B. 8 does not define what constitutes aiding or abetting, it expressly provides that "paying for or reimbursing the costs of an abortion" is prohibited activity. *Id.* S.B. 8's aiding-and-abetting liability would apply "regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of" S.B. 8. *Id.*

75. Even if someone does not actually perform a prohibited abortion or aid a prohibited abortion, the Act provides that they can still be sued if they merely intend to do so. *Id.* § 171.208(a)(3).

### (iii) *Enforcement actions and penalties for non-compliance*

76. S.B. 8 expressly precludes the state or any political subdivision, as well as executive-branch officials and district and county attorneys, from directly enforcing the six-week ban. *Id.* § 171.207(a). Instead, S.B. 8 creates a private, civil enforcement action: "Any person, other than an officer or employee of a state or local governmental entity in this state, may bring a civil action against any person" who performs a prohibited abortion, aids or abets a prohibited abortion, or intends to engage in these activities. *Id.* § 171.208(a).

77. Besides government officials, the only people not permitted to initiate an S.B. 8 enforcement action are those "who impregnated the abortion patient through an act of rape, sexual assault, incest," or certain other crimes. *Id.* § 171.208(j). However, because the six-week ban itself contains no exception for pregnancies resulting from rape, sexual assault, or incest, anyone *other* than the perpetrator could still sue a clinic, physician, friend, or family member who assists a patient in terminating a pregnancy that resulted from the offense.

78. S.B. 8 does not permit suits against abortion patients. *Id.* § 171.206(b)(1). But it provides a ready tool for abusive and manipulative partners or family members to try to block a patient's abortion decision. Under S.B. 8, if such individuals know about a patient's plan to obtain an abortion, they could sue the patient's abortion provider, or anyone else who "intends" to assist with that abortion, to try to prevent the patient from accessing care. *Id.* § 171.208(a)(3).

79. S.B. 8 imposes draconian penalties. Where an S.B. 8 claimant prevails, "the court shall award": (1) "injunctive relief sufficient to prevent" future violations or conduct that aids or

abets violations; (2) "statutory damages" to the claimant "in an amount of not less than $10,000 for each abortion" that was provided or aided and abetted; and (3) the claimant's "costs and attorney's fees." *Id.* § 171.208(b). S.B. 8 does not expressly require the claimant to allege or prove any injury to obtain an award.

### (iv)     *The rigged nature of the enforcement proceedings*

80.     At every turn, S.B. 8's rules for the enforcement proceedings sharply diverge from those normally applicable to Texas litigants and make it impossible for those sued to fairly defend themselves. The proceedings conscript the state courts into enforcing this unconstitutional law while imposing maximum burdens on abortion providers and other people who are sued.

81.     ***Statewide venue:*** S.B. 8 allows "any person"—including those with no connection to the abortion or the patient, and those who may be motivated by hostility to abortion rights or desire for financial gain—to file lawsuits in their home counties and then veto transfer to a more appropriate venue. As a result, abortion providers and alleged aiders and abettors could be forced to defend themselves in multiple, simultaneous enforcement proceedings in courts across the state. *See id.* § 171.210(a)(4) (permitting suit in the claimant's county of residence if "the claimant is a natural person residing in" Texas); *id.* § 171.210(b) (providing that S.B. 8 "action may not be transferred to a different venue without the written consent of all parties"). In contrast, venue in Texas is generally limited to where the events giving rise to a claim took place or where the defendant resides, *see* Tex. Civ. Prac. & Rem. Code § 15.002(a), and a Texas state court may generally transfer venue "[f]or the convenience of the parties and witnesses and in the interest of justice," *id.* § 15.002(b).

82.     ***One-way fee-shifting in favor of S.B. 8 claimants:*** S.B. 8 provides that in enforcement proceedings, anyone who brings an S.B. 8 claim and prevails is entitled to recover

costs and attorney's fees. S.B. 8 § 171.208(b)(3). Meanwhile, abortion providers and other people

sued under S.B. 8 cannot be awarded costs or attorney's fees if they prevail, no matter how many

times they are sued or the number of courts in which they must defend, and irrespective of the fact

that *every* S.B. 8 claim is barred by binding federal law. *Id.* § 171.208(i).

83.    ***Elimination of defenses:*** S.B. 8 purports to bar people who are sued from raising

seven defenses under the Act, including that they believed the law was unconstitutional; that they

relied on a court decision, later overruled, that was in place at the time of the acts underlying the

suit; or that the patient consented to the abortion. *Id.* § 171.208(e)(2), (3). S.B. 8 also states that

people who are sued may not rely on non-mutual issue or claim preclusion, or rely as a defense on

any other "state or federal court decision that is not binding on the court in which the action" was

brought. *Id*. § 171.208(e)(4), (5). The clear import of these provisions is to cast a pall on

constitutionally protected activity, to force abortion providers and others who assist them to defend

themselves over and over again, and to hamstring that defense.

84.    ***Redefinition of federal abortion law:*** S.B. 8 also purports to override binding

federal law when applied in state-court enforcement proceedings. Under an "unbroken line" of

Supreme Court cases, "[s]tates may *regulate* abortion procedures prior to viability so long as they

do not impose an undue burden" on a patient's right to abortion, but states "may not ban abortions."

*Jackson Women's Health Org. v. Dobbs* ("*Jackson Women's I*"), 945 F.3d 265, 269 (5th Cir. 2019),

*cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021). The U.S. Supreme Court has

articulated an undue-burden balancing standard that applies to assess the constitutionality of

abortion regulations. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 877–78 (1992). But

as every court to consider a similar ban, including the Fifth Circuit, has concluded, a ban at six

weeks can never survive constitutional review. *Jackson Women's Health Org. v. Dobbs* ("*Jackson*

*Women's II*"), 951 F.3d 246, 248 (5th Cir. 2020) (striking six-week ban because "cardiac activity can be detected well before the fetus is viable [and] [t]hat dooms the law"). Despite this federal framework and Fifth Circuit precedent, S.B. 8 would require state courts to weigh the undue burden anew in every case as part of an "affirmative defense" in enforcement actions, and even then would fundamentally "limit[]" that test. S.B. 8 § 171.209(c), (d). As one example, under S.B. 8's distorted version of the undue burden "defense," an abortion provider could not rely on the Act's practical effect on abortion access across the state, *id.* § 171.209(d)(2)), even though federal courts adjudicating undue-burden claims regularly do so, *see, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2312–13. Further, Section 5 of S.B. 8 attempts to create new rules of construction and severability, only as they apply to state abortion laws and regulations. S.B. 8 § 5 (to be codified at Tex. Gov. Code § 311.036).

85.     Moreover, S.B. 8 directs state-court judges to ignore judgments and injunctions issued by federal courts, for example, by telling state courts to refuse to apply non-mutual collateral estoppel based on such judgments, and by mandating that they ignore whether a federal injunction expressly permitted activity by an abortion provider or other person sued in S.B. 8 proceedings. S.B. 8 § 171.208(e)(4), (5).

### B.     S.B. 8, Section 4:  The Fee-Shifting Provision to Deter All Challenges to Texas Abortion Restrictions

86.     Section 4 of S.B. 8 creates an unprecedented and draconian one-way fee-shifting provision designed to deter any legal challenges to Texas abortion restrictions and to penalize anyone who tries to bring such a challenge. This provision applies to any person—including a party's lawyers—who seeks injunctive or declaratory relief to prevent enforcement of S.B. 8. S.B. 8 § 30.022. And it goes beyond S.B. 8, reaching *any* challenge to a "law that regulates or

restricts abortion," or that excludes those who "perform or promote" abortion from participating in a public funding program. *Id.*

87.     This fee provision purports to apply in state and federal court, and to any state or federal claim, including Section 1983 claims brought to vindicate federal constitutional rights.

88.     Under this provision, civil-rights plaintiffs and their attorneys can be forced to pay defendants' attorney's fees unless they run the table in litigation, prevailing on every claim they brought. If a court dismisses a claim brought by the civil-rights plaintiff, regardless of the reason, or enters judgment in the other party's favor on that claim, the party defending the abortion restriction is deemed to have "prevail[ed]." S.B. 8 § 30.022(b). That is presumably true even if the court ultimately enjoins the challenged abortion restriction in full after, for example, rejecting one claim pleaded in the alternative or dismissing another rendered moot by circumstance.

89.     According to Section 4 of S.B. 8, the party seeking fees need not even have asked for them in the underlying litigation. Rather, that party can file a new lawsuit against the abortion-rights advocate or their attorneys and law firms any time within three years of the claim resolution, thus choosing a different venue to litigate the fee claims before a judge who did not preside over the initial case. *Id.* § 30.022(c), (d)(1).

90.     S.B. 8 then directs state courts resolving this new species of fee claims to start from scratch. According to S.B. 8, they cannot even consider whether the court in the underlying case already denied fees to the party defending the abortion restriction, or already considered the application of S.B. 8 Section 4 and held it "invalid, unconstitutional, or preempted by federal law." *Id.* § 30.022(d)(3). Nor does S.B. 8 explicitly limit fees to what is reasonable, unlike other fee-shifting statutes such as 42 U.S.C. § 1988.

### III.    IRREPARABLE HARM CAUSED BY S.B. 8

#### A.    Impact on Abortion Patients

91.    If S.B. 8 is permitted to take effect, many Texans will be forced to carry their pregnancies to term, to attempt to scrape together funds to obtain an abortion out of state, or possibly to attempt to self-manage their own abortions without access to accurate medical information. Currently, approximately 85-90% of people who obtain abortions in Texas are at least six weeks into pregnancy. Regardless of outcome, S.B. 8 will impose severe and irreparable harm on patients.[7]

92.    Being forced to continue a pregnancy against one's will jeopardizes a person's physical, mental, and emotional health, as well as the stability and well-being of their family, including existing children.

93.    Even for someone who is otherwise healthy and has an uncomplicated pregnancy, being forced to carry that pregnancy to term and give birth poses serious medical risks with both short- and long-term consequences for the patient's physical health and mental and emotional well-being. For someone with a medical condition caused or exacerbated by pregnancy, these risks are increased.

94.    For people experiencing intimate partner violence, forced pregnancy also often exacerbates the risk of violence and further tethers the pregnant person to their abuser.

95.    In addition, forced pregnancy will add to the anguish of patients and their families who receive fetal diagnoses that are incompatible with sustained life after birth—forcing patients

---

[7] *See* Kari White, et al., *Research Brief: Texas Senate Bill 8: Medical and Legal Implications*, Tex. Policy Evaluation Project (July 2021), *available at* http://sites.utexas.edu/txpep/files/2021/07/TxPEP-research-brief-SB8.pdf.

to carry doomed pregnancies for months and suffer the physical and emotional pains of labor and delivery, knowing all the while that their child will not survive.

96.     S.B. 8 will be particularly devastating for Texans of color, particularly Black and Latinx populations, as well as for Texans with low incomes and those living in rural areas—communities that already face heightened barriers to medical care.

97.     Low-income and Black and Latinx populations seek abortions at a higher rate than wealthier and white populations (both in Texas and nationally) due to inadequate access to contraceptive care, income inequity, and other facets of structural racism. These communities will thus necessarily bear an outsized share of S.B. 8's burdens.

98.     Black Texans will also disproportionately suffer the gravest consequences of forced pregnancy if S.B. 8 is allowed to take effect in light of the significantly higher rates of maternal mortality in their communities.

99.     Those who attempt to travel out of state to access care will have to pay for and arrange transportation, childcare, and time off work. Because the majority of abortion patients are poor or have low incomes, these financial and other costs may be insurmountable or require them to forgo other basic needs for themselves and their existing families.

100.     Even those able to amass funds and make arrangements to travel outside Texas for care will be delayed in obtaining an abortion. While abortion is very safe at all stages, the risks increase as pregnancy advances. Moreover, the cost of an abortion generally increases with gestational age.

101.     Additionally, by targeting individuals who provide financial, practical, or emotional support for abortion access, S.B. 8 will decimate the support system on which Texans with low incomes rely to access abortion. Indeed, by imposing aiding-and-abetting liability

"regardless of whether the person knew or should have known that the abortion would be performed or induced in violation" of S.B. 8, *id.* § 171.208(a)(2), it will chill support even for those few early abortions that remain permissible under S.B. 8.

**B.   Impact on Provider Plaintiffs and Their Physicians and Staff**

102.   S.B. 8 subjects the Provider Plaintiffs and their staff to a Hobson's choice. If they stop providing abortions and engaging in other activities that assist with abortion provision after six weeks of pregnancy as S.B. 8 requires, they will be forced to turn away patients in need of constitutionally protected care, and many will lose or lay off staff in light of the reduced services. Many will soon have to shutter their doors permanently because they cannot sustain operations if barred from providing the bulk of their current care. And as Texas's previous attempts at restricting abortion have demonstrated, abortion providers forced to close their doors may not ever reopen, even if a court later intervenes.

103.   If these abortion providers instead offer abortion in violation of S.B. 8, they reach the same outcome with even longer-term consequences. They and their staff could be forced to defend dozens if not hundreds of simultaneous S.B. 8 lawsuits scattered across the state. And if that campaign of harassment does not alone bankrupt the abortion providers, they will quickly accrue catastrophic financial liability under S.B. 8's monetary penalty of at least $10,000 per abortion. Moreover, a steady stream of random strangers could seek injunctive relief preventing the abortion providers from performing prohibited abortions going forward—and do so in any of hundreds of state courts of their choosing.

104.   There is no question that vigilante enforcement lawsuits under S.B. 8 will be filed if the Provider Plaintiffs continue performing abortions. Anti-abortion protestors in Texas frequently track clinic operations and staff, including by, for example, video recording staff as they

enter and exit health centers. Individuals opposed to abortion also regularly file false complaints with licensing agencies to trigger government investigations.

105.    Moreover, months before S.B. 8 was even scheduled to take effect, two individuals trespassed onto Whole Woman's Health Alliance's private property to distribute a letter informing staff that they can be sued for providing or facilitating abortions after the detection of a "fetal heartbeat" and encouraging staff to report their colleagues to the letter's authors.

106.    Similarly, Defendant Mark Lee Dickson has openly called for people to sue their local abortion providers under S.B. 8, has offered to connect interested claimants with attorneys, has threatened to sue PPGT Surgical Health Services under a functionally identical Lubbock ordinance, and has taken deceptive steps to test PPGT Surgical Health Services' compliance with that ordinance. *See supra* ¶ 50 n.4. Due to these threats and others, PPGT Surgical Health Services has already been forced to stop providing abortions in Lubbock, while it challenges the Lubbock ordinance in another federal lawsuit. With the Lubbock clinic not currently providing abortion, the next nearest abortion provider is three hundred miles away.

107.    In addition to the costs of defending S.B. 8 lawsuits and the risk of mandatory statutory damages and injunctions, the Provider Plaintiffs and staff risk professional discipline and other liability for violations of the Act. While the Government Official Defendants lack authority to directly enforce S.B. 8, they retain the authority and duty to enforce *other* statutes and regulations against licensed abortion facilities, ambulatory surgical centers, pharmacies, physicians, physician assistants, nurses, and pharmacists that could be triggered by a violation of S.B. 8. *See supra* ¶¶ 51-55.

108.    In addition to these harms, S.B. 8 Section 4's fee-shifting provision to penalize and deter challenges to *all* abortion laws, not just S.B. 8, will burden the Provider Plaintiffs' right to

petition the courts and to speak freely, exposing them to potentially ruinous liability for attorney's fees and costs because they attempt to vindicate their own and others' constitutional rights through public-interest litigation.

109.     In sum, because of S.B. 8, the Provider Plaintiffs and their staff will suffer profound harm to their property, business, reputations, and a deprivation of their own constitutional rights.

### C.     Impact on Advocate Plaintiffs

110.     If S.B. 8 forces the Provider Plaintiffs and their staff to stop providing abortion care after six weeks of pregnancy, most Texans will need to leave the state to obtain an abortion. This will require the Advocate Plaintiffs to redirect their limited resources to out-of-state travel, even though it inflicts heavy—sometimes insurmountable—burdens on their clients, who experience intersecting forms of oppression. In these ways, S.B. 8 will subvert the Advocate Plaintiffs' aim to help ensure that every person can exercise reproductive autonomy regardless of circumstance.

111.     If the Advocate Plaintiffs continue to support those obtaining abortions in Texas, they are likely to face vigilante enforcement lawsuits for aiding and abetting abortions prohibited by S.B. 8 and risk mandatory statutory damages and injunctions. Defendant Dickson and other entities opposed to abortion access have already targeted some of the Advocate Plaintiffs for their efforts to ensure especially vulnerable Texans can terminate a pregnancy. Dickson, for example, drafted an ordinance adopted by seven towns in Texas branding Plaintiffs The Afiya Center, Lilith Fund, and TEA Fund as "criminal organizations," and has publicly referred to the "Lilith Fund and other abortion-aiding organizations" as "tak[ing] part in the murder of innocent unborn human beings."

112.     Other Advocate Plaintiffs face the threat of vigilante enforcement lawsuits with unknown liability under S.B. 8 for simply engaging in First Amendment-protected speech and

other activity in support of abortion. Rev. Forbes and Rev. Kanter risk costly and burdensome civil lawsuits for providing spiritual and emotional counseling to patients and parishioners, as they are called by their own religious beliefs to provide. This risk extends to other clergy members, counselors, and advisors (such as sexual assault and genetic counselors), as S.B. 8 incentivizes lawsuits accusing individuals of aiding and abetting prohibited abortions.

113.    Defending against S.B. 8 suits will drain the Advocate Plaintiffs' resources and prevent them from operating, regardless of whether the suits are ultimately dismissed.

## CLASS ALLEGATIONS

114.    This lawsuit is properly maintained as an action against two defendant classes under Federal Rule of Civil Procedure 23(b)(1)(A) or alternatively under Rule 23(b)(2).

### A.    Judicial Defendant Class

115.    The first class consists of all non-federal judges in the State of Texas with jurisdiction over civil actions and the authority to enforce S.B. 8 ("Judicial Defendant Class").

116.    Any separate actions commenced against individual judges for the purpose of challenging their enforcement of S.B. 8 may result in inconsistent decisions by the courts presiding over those actions.

117.    Separate actions could put Plaintiffs in the untenable position of not knowing which of multiple, incompatible interpretations and rulings they must comply with to avoid violating the law and risking severe statutory damages.

118.    There are potentially more than 1,000 non-federal judges in the State of Texas with jurisdiction over civil suits brought under S.B. 8 where the amount in controversy exceeds Two-Hundred Dollars ($200.00). Additionally, members of the proposed Judicial Defendant Class are located in each of Texas's 254 counties. Given the size of the class and this geographic dispersal,

it is impracticable to join all judges with power to enforce S.B. 8 in order to provide protection to all potential defendants in those actions.

119.    Resolution of any one of the legal issues raised in this case will affect similarly each member of the proposed Judicial Defendant Class, by determining whether, and to what extent, they may enforce S.B. 8 under the U.S. Constitution and federal law. Moreover, the relief sought in this case does not turn on circumstances specific to particular members of the proposed defendant class. Accordingly, there are questions of law common to the class.

120.    Defendant Judge Jackson is an adequate class representative because his court has jurisdiction over civil claims with an amount in controversy greater than $200.00. *See* Tex. Const. art. V, §§ 1, 8. S.B. 8 civil enforcement actions may be brought in the 114th District Court where Judge Jackson presides. Judge Jackson is directed to enforce compliance with the Act by implementing the remedies mandated by S.B. 8. In this action, Plaintiffs seek a declaratory judgment that S.B. 8 is invalid and cannot be enforced by any Defendant, including, *inter alia*, the Class Representative. Accordingly, the Class Representative is qualified as a member of the defined class.

121.    The defenses which the Class Representative will raise will be typical of all members of the proposed Judicial Defendant Class. The claims against which the Class Representative must defend challenge the constitutionality of the Act and are asserted against all members of the proposed Judicial Defendant Class. Further, the Class Representative and the other class members hold a common position with respect to Plaintiffs, a position that is defined by statutory obligations and not by personal relationships. Therefore, any defenses the Class Representative asserts—and the legal theories on which they are based—will be available to the other class members.

122.    The Class Representative's position is aligned with that of the other class members because all are charged with enforcing S.B. 8. For purposes of this suit, the Class Representative has no interests antagonistic to or in conflict with the interests of other members of the proposed class. Because the functions of all judges with respect to this statute are substantially the same, the Class Representative will be able to fairly and adequately represent the interests of all judges with authority to hear civil suits under S.B. 8.

**B.    Clerk Defendant Class**

123.    The second class consists of the clerks in all non-federal courts in the State of Texas with jurisdiction over civil actions and the authority to enforce S.B. 8 ("Clerk Defendant Class").

124.    Any separate actions commenced against individual clerks for the purpose of challenging their role in enforcing S.B. 8 may result in inconsistent decisions by the courts presiding over those actions.

125.    Separate actions could put Plaintiffs in the untenable position of not knowing which of multiple, incompatible interpretations and rulings they must comply with to avoid violating the law and risking severe statutory damages.

126.    There are likely more than 500 clerks of the non-federal courts in the State of Texas with jurisdiction over civil suits brought under S.B. 8. Additionally, members of the proposed Clerk Defendant Class are located throughout the state. Given the size of the class and this geographic dispersal, it is impracticable to join all clerks for the courts with power to enforce S.B. 8 in order to provide protection to all potential defendants in those actions.

127.    Resolution of any one of the legal issues raised in this case will affect similarly each member of the proposed Clerk Defendant Class, by determining whether, and to what extent, they may accept filing of and issue citations for service of process in S.B. 8 civil actions under the

U.S. Constitution and federal law. Moreover, the relief sought in this case does not turn on circumstances specific to particular members of the proposed Clerk Defendant Class. Accordingly, there are questions of law common to the class.

128.     Defendant Penny Clarkston is an adequate class representative because she is the Clerk for the District Court of Smith County, which has jurisdiction over civil claims with an amount in controversy greater than $200.00. *See* Tex. Const. art. V, §§ 1, 8. S.B. 8 civil enforcement actions may be brought in the District Court of Smith County. Defendant Clarkson is directed to accept filing of and issue citations for service of process in S.B. 8 civil actions. In this action, Plaintiffs seek a declaratory judgment that S.B. 8 is invalid and that enforcement actions cannot be instituted by any Defendant, including, *inter alia*, the Class Representative, as well as injunctive relief precluding the members of the Clerk Defendant Class from participating in S.B. 8's enforcement. Accordingly, the Class Representative is qualified as a member of the defined class.

129.     The defenses which the Class Representative will raise will be typical of all members of the proposed Clerk Defendant Class. The claims against which the Class Representative must defend challenge the constitutionality of the Act and are asserted against all members of the proposed Clerk Defendant Class. Further, the Class Representative and the other class members hold a common position with respect to Plaintiffs, a position that is defined by statutory obligations and not by personal relationships. Therefore, any defenses the Class Representative asserts—and the legal theories on which they are based—will be available to the other class members.

130.     The Class Representative's position is aligned with that of the other class members because all are charged with playing a role in the enforcement of S.B. 8. For purposes of this suit,

the Class Representative has no interests antagonistic to or in conflict with the interests of other members of the proposed class. Because the functions of all clerks with respect to this statute are substantially the same, the Class Representative will be able to fairly and adequately represent the interests of all clerks for courts with authority to hear civil suits under S.B. 8.

## CLAIMS FOR RELIEF

### CLAIM I

**(Fourteenth Amendment Substantive Due Process Right to Abortion—Section 3 of S.B. 8)**

131.   The allegations in paragraphs 1 through 130 above are incorporated as if fully set forth herein.

132.   Under *Roe v. Wade*, 410 U.S. 113 (1973), and nearly fifty years of unbroken precedent, a patient has a constitutionally protected right to end a pregnancy before viability.

133.   By prohibiting pre-viability abortion upon detection of a "fetal heartbeat" as defined in the Act, which may occur as early as six weeks LMP (or even sooner), Section 3 of the Act violates the substantive due process rights of Plaintiffs' patients to pre-viability abortion, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

### CLAIM 2

**(Fourteenth Amendment Equal Protection—Section 3 of S.B. 8)**

134.   The allegations in paragraphs 1 through 133 above are incorporated as if fully set forth herein.

135.   The Equal Protection Clause commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike.

136.    Section 3 of S.B. 8 singles out abortion providers and people who "aid or abet" the constitutionally protected right to abortion, or intend to do these things, and then treats this category of people differently from all other defendants in civil litigation in Texas.

137.    S.B. 8 alters the procedural rules and limits the substantive defenses and arguments available in S.B. 8 enforcement proceedings to skew those proceedings and harm those sued under S.B. 8 in violation of the constitutional guarantee of equal protection. The statute's venue and fee-shifting provisions, its openness to claimants without any connection to an abortion, its evisceration of defenses and arguments, and its attempt to redefine federal law, all work together to disadvantage abortion providers and supporters. And they do so toward the goal of enforcing a patently unconstitutional abortion ban that is unenforceable under binding Supreme Court precedent.

138.    The purpose for S.B. 8's enforcement provisions is animus and to burden the exercise of constitutional rights. Those are not legitimate government interests. Even if Defendants could assert a compelling government interest, S.B. 8's enforcement provisions are not narrowly tailored. Accordingly, S.B. 8's enforcement scheme cannot survive any level of review, and it violates Plaintiffs' equal protection rights.

## CLAIM 3

**(Fourteenth Amendment, Void for Vagueness—Section 3 of S.B. 8)**

139.    The allegations in paragraphs 1 through 138 above are incorporated as if fully set forth herein.

140.    S.B. 8 imposes quasi-criminal penalties on persons who provide an abortion in violation of the six-week ban, engage in conduct that aids or abets an abortion that violates the six-week ban, or intends to do these things.

141.    A law that imposes such penalties is void for vagueness, and thus inconsistent with the federal guarantee of due process, if it authorizes or encourages arbitrary and discriminatory enforcement, or fails to provide fair warning of its prohibitions so that ordinary people may conform their conduct accordingly.

142.    S.B. 8 unlawfully empowers arbitrary and discriminatory enforcement by deputizing private individuals to enforce state law in violation of clearly established constitutional rights. Its terms incentivize purely ideological plaintiffs to force their opponents into court to defend themselves, and to do so without the legal and practical checks that might otherwise temper government prosecutors or enforcement agencies. S.B. 8 also empowers arbitrary and discriminatory enforcement because its penalties are standardless.

143.    The Act also fails to adequately inform regulated parties and those charged with the law's enforcement of what conduct is prohibited and/or leads to penalties. S.B. 8 states that abortion providers and others assisting them may be held liable for violating the Act if a court decision permitting their conduct at the time it occurred is later overruled on appeal or by a subsequent court. S.B. 8 § 171.208(e)(3). Similarly, under S.B. 8, aiding-and-abetting liability may attach "regardless of whether [a] person knew or should have known that the abortion" they aided "would be performed or induced in violation" of the six-week ban. *Id.* § 171.208(a)(2).

144.    In all of these circumstances, the only way for people to ensure they do not run afoul of S.B. 8 is by refusing to perform or assist with any abortions (or "intend" to do either). Due process does not permit such uncertainty, particularly where, as here, the challenged law threatens to inhibit the exercise of constitutionally protected rights.

145.    S.B. 8 is, therefore, unconstitutionally vague and violates Plaintiffs' due process rights.

## CLAIM 4

**(First and Fourteenth Amendments, Freedom of Speech and the Right to Petition—
Section 3 of S.B. 8)**

146.    The allegations in paragraphs 1 through 145 above are incorporated as if fully set forth herein.

147.    Plaintiffs include physicians, health centers, nonprofit organizations, and individuals committed to ensuring that all Texas residents have access to safe abortion care regardless of their financial means or other sociodemographic characteristics. To serve this end, they collectively engage in public education, organizing, and/or lobbying activities, and help ensure minors who are unable to obtain written parental consent to terminate a pregnancy have free legal representation in judicial-bypass proceedings. They also provide direct financial, practical, and spiritual support to Texas residents seeking abortion.

148.    S.B. 8's broad prohibition on activity that "aids or abets" a covered abortion, and on an intent to engage in such activity even without corresponding action, burdens Plaintiffs' speech and expressive conduct and ability to petition the courts, as described above. Because S.B. 8 does so without adequate justification, it cannot possibly survive the strict scrutiny that applies under the First Amendment.

149.    Even if S.B. 8's prohibition were viewed as a regulation of conduct that only incidentally burdens speech, the prohibition would still be invalid because it serves no legitimate, much less important, governmental purpose and is otherwise not adequately justified to satisfy intermediate scrutiny.

## CLAIM 5

### (Federal Preemption—Section 3 of S.B. 8)

150.    The allegations in paragraphs 1 through 149 above are incorporated as if fully set forth herein.

151.    The U.S. Constitution is the supreme law of the land, and the Supreme Court is the final arbiter of its meaning. State statutes inconsistent with rights conferred by the U.S. Constitution or other federal law must give way. S.B. 8 defies this core tenet undergirding the rule of law.

152.    S.B. 8 purports to require that for a person to argue that the six-week ban violates patients' constitutional right to abortion, the person must prove in each enforcement action that an award of relief in that action will impose an undue burden. This conflicts with the Supreme Court's constitutional precedents, which hold that states may not prohibit pre-viability abortions, and that balancing the burdens and state interests anew under the undue-burden test in a ban case is not permissible. This limitation also disregards and purports to redefine the actual undue-burden standard articulated by the U.S. Supreme Court, in conflict with the Supreme Court's constitutional precedents.

153.    S.B. 8 further directs state-court judges to ignore judgments and injunctions issued by federal courts, *id*. § 171.208(e)(4), (5), contrary to decades of U.S. Supreme Court precedent. Under that case law, states cannot simply give federal-court judgments in federal-question cases "whatever effect they would give their own judgments," but instead "must accord them the effect" that federal law provides. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001) (emphasizing that the U.S. Supreme Court "has the last word on the claim-preclusive effect of *all* federal judgments"); *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (confirming that state legislators and

43

judicial officers may not "at will[] annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments").

154.    Because S.B. 8's six-week ban and corresponding enforcement regime conflict with U.S. Supreme Court interpretations of the federal constitution that confer clear rights on Plaintiffs and their patients, they cannot validly be applied.

**CLAIM 6**

**(Section 1988 Preemption—Section 4 of S.B. 8)**

155.    The allegations in paragraphs 1 through 154 above are incorporated as if fully set forth herein.

156.    Section 4 of S.B. 8 would permit defendants in Section 1983 litigation to recover attorney's fees and costs if a court ultimately dismisses or rejects any claim against them in cases where someone challenges a state abortion regulation or restriction. The defendants could seek to recoup these costs from parties and their attorneys in an entirely new proceeding before a different judge within three years of the resolution of the substantive claim. No showing of frivolousness on the part of Plaintiffs would be required.

157.    In contrast, 42 U.S.C. § 1988 sets out a comprehensive fee-shifting regime applicable to Section 1983 and certain other federal civil-rights claims, regardless of whether those claims are raised in state or federal court. Section 1988 provides civil-rights plaintiffs with a clear right to recover their fees for covered claims where they are "prevailing parties." It also provides such plaintiffs with a clear right *not* to be liable for the fees and costs of a prevailing defendant, unless a district court finds that the plaintiff's action was frivolous, unreasonable, or without foundation. Section 1988 further delineates civil-rights plaintiffs' rights by instructing that a request for attorney's fees must be made in the "action or proceeding to enforce" a federal civil

rights statute, including Section 1983, and that the fees, where assessed, are allowed only "as part of the costs." 42 U.S.C. § 1988(b).

158.    Section 4 of S.B. 8 directly conflicts with Section 1988 and frustrates Congress's objective in adopting it. Because Section 4 of S.B. 8 is directly at odds with Section 1988, and violates the rights conferred on Plaintiffs by that federal statute, it is preempted and may not be applied to Plaintiffs in this or future Section 1983 litigation.

## CLAIM 7

**(First and Fourteenth Amendments, Freedom of Speech and the Right to Petition—
Section 4 of S.B. 8)**

159.    The allegations in paragraphs 1 through 158 are incorporated as if fully set forth herein.

160.    The legal services and litigation covered by Section 4 of S.B. 8 are a means for Plaintiffs and their attorneys to achieve lawful objectives through the court system, and they serve as a form of political expression.

161.    Under Section 4, only litigants motivated to block the enforcement of laws that "regulate[] or restrict[] abortion" or laws that provide funding to entities who "perform or promote" abortion are punished for their advocacy in litigation. S.B. 8 § 30.022. In contrast, S.B. 8 does not impose a penalty on litigants whose goal is to uphold such laws, or to challenge laws that expand access to abortion or provide funding to abortion providers or advocates.

162.    In both its purpose and effect, Section 4 is a viewpoint- and content-based restriction on Plaintiffs' abortion-related advocacy, including their petitioning activity. By threatening Plaintiffs and their attorneys with massive liability for fees and costs, Section 4 will necessarily chill the exercise of rights to free speech and to petition activity protected by the First Amendment.

163.     Because SB 8 limits Plaintiffs' right to speak freely and to petition the courts for relief, without adequate justification, S.B. 8 violates the First Amendment and should be declared invalid and unenforceable.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A.     To certify a class of Judicial Defendants as defined in paragraph 115 pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) or alternatively under Rule 23(b)(2);

B.     To certify a class of Clerk Defendants as defined in paragraph 123 pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) or alternatively under Rule 23(b)(2);

C.     To issue permanent, and if necessary, preliminary injunctive relief in advance of S.B. 8's September 1, 2021, effective date that:

(1)     restrains the Clerk Defendants, their officers, agents, servants, employees, attorneys, and any persons in active concert or participation with them, from participating in the enforcement of S.B. 8 in any way, including by accepting for filing or taking any other action in the initiation of a lawsuit brought under S.B. 8;

(2)     restrains Defendant Mark Lee Dickson, his agents, servants, employees, attorneys, and any persons in active concert or participation with him, from enforcing S.B. 8 in any way;

(3)     restrains the Government Official Defendants, their officers, agents, servants, employees, attorneys, and any persons in active concert or participation with them, from enforcing S.B. 8 in any way, including by applying S.B. 8 as a basis for enforcement of laws or regulations in their charge;

D.     To enter a judgment against all Defendants declaring that S.B. 8 violates the First and Fourteenth Amendments to the U.S. Constitution and the Supremacy Clause and is preempted

by 42 U.S.C. §§ 1983 and 1988 and authoritative rulings of the U.S. Supreme Court regarding the right to abortion and the res judicata effect and binding nature of federal court judgments and injunctions;

E.     To enter a judgment against all Defendants declaring that because Plaintiffs' advocacy, education, organizing, and lobbying activities, petitioning of the courts for relief, and support for abortion patients is protected by the First Amendment, they cannot be the basis for liability under S.B. 8;

F.     To award Plaintiffs their costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988;

G.     To retain jurisdiction after judgment for the purposes of resolving any future fee disputes between the parties and issuing further appropriate injunctive relief if the Court's declaratory judgment is violated; and

H.     To grant such other and further relief as the Court deems just and proper.

Dated:  July 13, 2021

Respectfully submitted,

_/s/ Christen Mason Hebert_

Christen Mason Hebert
(Texas Bar No. 24099898)
Johns & Hebert PLLC
2028 East Ben White Blvd
Suite 240-1000
Austin, TX 78741
(512) 399-3150
chebert@johnshebert.com

_Attorney for all Plaintiffs_

Marc Hearron (Texas Bar No. 24050739)*
Center for Reproductive Rights
1634 Eye St., NW, Suite 600
Washington, DC  20006
(202) 524-5539
mhearron@reprorights.org

Molly Duane*
Kirby Tyrrell*
Melanie Fontes*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
ktyrrell@reprorights.org
mfontes@reprorights.org

Jamie A. Levitt*
J. Alexander Lawrence*
Morrison & Foerster LLP
250 W. 55th Street
New York, NY 10019
(212) 468-8000
jlevitt@mofo.com
alawrence@mofo.com

_Attorneys for Whole Woman's Health, Whole Woman's Health Alliance, Marva Sadler, Southwestern Women's Surgery Center, Allison_

Julie Murray*
Richard Muniz*
Planned Parenthood Federation of America
1110 Vermont Ave., NW Ste. 300
Washington, DC 20005
(202) 973-4997
julie.murray@ppfa.org
richard.muniz@ppfa.org

_Attorneys for Planned Parenthood of Greater Texas Surgical Health Services, Planned Parenthood South Texas Surgical Center, Planned Parenthood Center for Choice, and Dr. Bhavik Kumar_

Julia Kaye*
Brigitte Amiri*
Chelsea Tejada*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
jkaye@aclu.org
bamiri@aclu.org
ctejada@aclu.org

Lorie Chaiten*
American Civil Liberties Union Foundation
1640 North Sedgwick Street
Chicago, IL 60614
(212) 549-2633
rfp_lc@aclu.org

Adriana Pinon (Texas Bar No. 24089768)
David Donatti (Texas Bar No. 24097612)
Andre Segura (Texas Bar No. 24107112)
ACLU Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966

*Gilbert, M.D., Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center, Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services, Houston Women's Reproductive Services, Reverend Daniel Kanter, and Reverend Erika Forbes.*

*\*Pro hac vice applications forthcoming*

apinon@aclutx.org
ddonatti@aclutx.org
asegura@aclutx.org

*Attorneys for Houston Women's Clinic*

Stephanie Toti
LAWYERING PROJECT
41 Schermerhorn Street #1056
Brooklyn, NY 11201
(646) 490-1083
stoti@lawyeringproject.org

Rupali Sharma*
LAWYERING PROJECT
197 Pine Street, Apt. 23
Portland, ME 04102
(908) 930-6445
rsharma@lawyeringproject.org

*Attorneys for The Afiya Center, Frontera Fund, Fund Texas Choice, Jane's Due Process, Lilith Fund for Reproductive Equity, North Texas Equal Access Fund*