IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WHOLE WOMEN'S HEALTH, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:21-CV-616-RP |
| | § | |
| JUDGE AUSTIN REEVE JACKSON, et. al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before this Court are Defendants Allison Vordenbaumen Benz, Stephen Brint Carlton, Ken Paxton, Katherine A. Thomas, Cecile Erwin Young, Austin Reeve Jackson, Penny Clarkston, and Mark Lee Dickson's (together, "Defendants") motions to dismiss, (Dkts. 48, 49, 50, 51), Plaintiffs' responses, (Dkts. 56, 57, 62), and Defendants' replies. (Dkts. 64, 66, 67).  related briefing. Having considered the parties' briefing, the record, and the relevant law, the Court will deny the motions.

## I. BACKGROUND

### A. Procedural Background

Plaintiffs[1] filed the instant action on July 13, 2021, requesting declaratory and injunctive relief to prevent Senate Bill 8 ("S.B. 8"), an abortion restriction bill signed into law by Governor Greg Abbott ("Abbott") (collectively ("Texas" or the "State"), from taking effect on September 1,

---

[1] Plaintiffs in this action include Whole Woman's Health, Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services ("Alamo"), Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center ("Austin Women's"), Houston Women's Clinic, Houston Women's Reproductive Services ("HWRS"), Planned Parenthood of Greater Texas Surgical Health Services ("PPGT Surgical Health Services"), Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), Planned Parenthood Center for Choice ("PP Houston"), Southwestern Women's Surgery Center ("Southwestern"), Whole Woman's Health Alliance, Allison Gilbert, M.D., Bhavik Kumar, M.D., (together, "the Provider Plaintiffs"), The Afiya Center, Frontera Fund, Fund Texas Choice, Jane's Due Process, Lilith Fund for Reproductive Equity ("Lilith Fund"), North Texas Equal Access Fund ("NTEA Fund"), Marva Sadler, Reverend Daniel Kanter, and Reverend Erika Forbes ("the Advocate Plaintiffs," and together with the "the Provider Plaintiffs," "Plaintiffs"). (Dkt. 1, at 9–14).

2021. (Compl., Dkt. 1, at 2); S. B. 8, 87th Leg., Reg. Sess. (Tex. 2021). That same day, Plaintiffs filed a motion for summary judgment on all their claims. (Mot. Summ. J., Dkt. 19). On July 16, 2021, Plaintiffs filed a motion to certify two defendant classes of non-federal judges and clerks in Texas with jurisdiction to enforce S.B. 8. (Mot. Certify Class, Dkt. 32). Defendants then moved to stay consideration of Plaintiffs' pending motion for summary judgment and motion to certify class until the Court's resolution of jurisdictional challenges Defendants planned to bring in motions to dismiss, (Dkt. 39), which the Court denied in setting a briefing schedule for the pending motions after holding a conference with the parties. (Dkts. 40, 47).

After being served, Defendants filed the instant motions to dismiss Plaintiffs' claims under the terms of the scheduling order issued by the Court. (Dkts. 48, 49, 50, 51). On August 7, 2021, Defendants Clarkston and Dickson filed a petition for writ of mandamus and emergency motion to stay with the Fifth Circuit, arguing that they should not have to respond to the merits of Plaintiffs' claims until the jurisdictional motions to dismiss were resolved by this Court. *See In re Clarkston*, No. 21-50708 (5th Cir. filed Aug. 7, 2021). After entering a temporary administrative stay of this action, the Fifth Circuit denied Defendants Clarkston and Dickson's petition for mandamus on August 13, 2021. *See id.* In the interim, Plaintiffs filed a motion for a preliminary injunction, which is set for a hearing on August 30, 2021. (Mot. Prelim. Inj., Dkt. 53; Order, Dkt. 61). The Court then issued an amended briefing schedule to clarify that jurisdictional challenges to Plaintiffs' suit would be reached before the merits of the claims. (Order, Dkt. 60).

### B. Senate Bill 8

S.B. 8 purports to ban all abortions performed on any pregnant person[2] where cardiac activity has been detected in the embryo, with no exceptions for pregnancies that result from rape,

---

[2] The Court notes that people other than those who identify as "women" may also become pregnant and seek abortion services. *See Accord Reprod. Health Servs. v. Strange*, 2021 WL 2678574, at *1 n.2 (11th Cir. June 30,

sexual abuse, incest, or a fetal defect incompatible with life after birth. S.B. 8 § 3 (to be codified at Tex. Health & Safety Code §171.204(a)). As explained below, S.B. 8 is enforced through a dual private and public enforcement scheme, whereby private citizens are empowered to bring civil lawsuits in state courts against anyone who performs, aids and abets, or intends to participate in a prohibited abortion, *see id.* §§ 171.208, 210, and the State may take punitive action against the Provider Plaintiffs through existing laws and regulations triggered by a violation of S.B. 8—such as professionally disciplining a physician who performs an abortion banned under S. B. 8. *See, e.g.,* Tex. Occ. Code §§ 164.053(a)(1)), 165.101; 243.011–.015, 245.012–.017; 301.10, 553.003, 565.001(a), 565.002.

### 1.   The Six-Week Ban on Abortions

The cornerstone of S.B. 8 is its requirement that physicians performing abortions in Texas determine whether a "detectable fetal heartbeat"[3] is present before performing an abortion. S.B. 8 § 3 (to be codified at Tex. Health & Safety Code §§ 171.203(b), 171.204(a)). S.B. 8 further bans any abortions performed once a "fetal heartbeat" has been detected or if the physician fails to perform a test for cardiac activity within an embryo ("the six-week ban"[4]). *Id.* The six-week ban contains no exception for pregnancies that result from rape or incest, or for fetal health conditions that are incompatible with life after birth—though it does contain an exception for "a medical

---

2021) ("Although this opinion uses gendered terms, we recognize that not all persons who may become pregnant identify as female.").

[3] S.B. 8 defines "fetal heartbeat" as "cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac." S.B. 8 § 171.201(1). Because an ultrasound can typically detect cardiac activity beginning at approximately six weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("LMP"), the Court notes that "fetal heartbeat" is a medically inaccurate term since what the law intends to refer to is "cardiac activity detected in an embryo."

[4] The Court will refer to S.B. 8's ban as a "six-week ban" to reflect that the ban covers all abortions performed approximately six weeks LMP, usually just two weeks after a missed menstrual period, when an embryo begins to exhibit electrical impulses but is not accurately defined as a "fetus" and does not have a "heartbeat." (Dkt. 1, at 22) ("[D]espite S.B. 8's use of the phrase 'fetal heartbeat,' the Act forbids abortion even when cardiac activity is detected in an embryo.").

emergency…that prevents compliance." S.B. 8 § 3 (to be codified at Tex. Health & Safety Code §171.205(a)).

S.B. 8 holds liable anyone who performs an abortion in violation of the six-week ban, and anyone who "knowingly" aids or abets the performance of an abortion performed six weeks after LMP. *Id.* § 171.208(a)(1)–(2). Although S.B. 8 does not define what constitutes aiding or abetting under the statute, it specifies that paying for or reimbursing the costs of the abortion falls under the six-week ban, which applies "regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of" S.B. 8. *Id.* In addition, a person need not even actually take steps to "aid and abet" a prohibited abortion to be held liable under the law if that person intended to help another person obtain an abortion six weeks from the patient's LMP. *Id.* § 171.208(a)(3).

2.   Enforcement of the Six-Week Ban

S.B. 8 is enforced against those who provide abortions or help patients obtain abortions through a dual private and public enforcement scheme. S.B. 8's centerpiece is its private enforcement scheme, which empowers private citizens to bring civil actions against anyone who allegedly performs, or aids and abets in the performance of, a banned abortion. *Id.* § 171.207(a).[5] Under S.B. 8's public enforcement mechanism, state agencies and authorities are tasked with enforcing state licensing and professional codes for healthcare provides, whose provisions are triggered by violations of S.B. 8. Tex. Occ. Code §§ 164.053(a)(1)), 301.101, 553.003.

Under S.B. 8's private enforcement scheme, any private citizen who is a "natural person residing in" Texas may bring suit under S.B. 8 in their county of residence and block transfer to a

---

[5] Despite having no exception to the six-week ban for pregnancies that result from rape or incest, S.B. 8 precludes those "who impregnated the abortion patient through rape, sexual assault, or incest, or other crimes" from bringing a civil suit under this section. *Id.* § 171.208(a). S.B. does not permit private citizens to bring civil suits again abortion patients. *Id.* § 171.206(b)(1).

more appropriate venue if not consented to by all parties. *See id.* § 171.210(a)(4) (permitting suit in the claimant's county of residence if "the claimant is a natural person residing in" Texas); *id.* § 171.210(b) (providing that S.B. 8 "action may not be transferred to a different venue without the written consent of all parties.").[6] Private citizens who prevail in civil suits brought under S.B. 8 may be awarded (1) "injunctive relief sufficient to prevent" future violations or conduct that aids or abets violations; (2) "statutory damages" to the claimant "in an amount of not less than $10,000 for each abortion" that was provided or aided and abetted; and (3) the claimant's "costs and attorney's fees." *Id.* § 171.208(b). A private citizen may prevail in a civil suit brought under S.B. 8 without alleging any injury caused by the defendants, in contravention of the traditional rules of standing. (Dkt. 1, at 26).

While empowering private enforcers, S.B. 8 limits the defenses available to defendants and subjects them to a fee-shifting regime skewed in favor of claimants. For example, defendants in S.B. 8 enforcement actions are prohibited from raising certain defenses enumerated under S.B. 8, including that they believed the law was unconstitutional; that they relied on a court decision, later overruled, that was in place at the time of the acts underlying the suit; or that the patient consented to the abortion. *Id.* § 171.208(e)(2), (3). S.B. 8 also states that defendants may not rely on non-mutual issue or claim preclusion or rely as a defense on any other "state or federal court decision that is not binding on the court in which the action" was brought. *Id.* § 171.208(e)(4), (5).

Although under binding Fifth Circuit precedent "[s]tates may regulate abortion procedures prior to viability so long as they do not impose an undue burden," Section 5 of S.B. 8 requires state judges to weigh the undue burden anew in every case as part of an "affirmative defense" in line with S.B. 8's new strictures regarding construction and severability of claims. S.B. 8 § 5 (to be codified at

---

[6] S.B. 8 bucks the usual rules in Texas that govern where a lawsuit can be filed and when a case can be transferred to a different county. Texas generally limits the venue where an action may be brought to one where the events giving rise to a claim took place or where the defendant resides, *see* Tex. Civ. Prac. & Rem. Code § 15.002(a), and a Texas state court may generally transfer venue "[f]or the convenience of the parties and witnesses and in the interest of justice," *id.* § 15.002(b).

Tex. Gov. Code § 311.036); S.B. 8 §§ 171.209(c), (d)(2)); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 269 (5th Cir. 2019), *cert. granted*, No. 19-1392, 2021 WL 1951792 (U.S. May 17, 2021) ("States may regulate abortion procedures prior to viability so long as they do not impose an undue burden" on a patient's right to abortion, but states "may not ban abortions.").

S.B. 8 further creates a novel fee-shifting regime slanted in favor of S.B. 8 claimants and proponents, not only in S.B. 8 enforcement actions but in any challenges to the law, including in the instant case. S.B. 8 § 30.022. Under Section 4 of S.B. 8 ("Section 4"), not only may S.B. 8 claimants recover their attorney's fees in enforcement actions, but plaintiffs and attorneys who participate in lawsuits challenging abortion restrictions in Texas may be liable for attorney's fees unless they prevail on all of their initial claims, regardless of the ultimate outcome of the litigation. *Id.* Indeed, Section 4 applies to any challenge, in state or federal court, to the enforcement of S.B. 8 or any "law that regulates or restricts abortion," or that excludes those who "perform or promote" abortion from participating in a public funding program. S.B. 8. S.B. 8 § 30.022.

Defendants in such a challenge need not request attorney's fees in the original lawsuit but may file a new lawsuit in a venue of their choosing to collect attorney's fees within three years of a resolution of the underlying case. *Id.* § 30.022(c), (d)(1). When resolving new lawsuits over attorney's fees, judges are precluded from taking into account whether the court in the underlying case already denied fees to the party defending the abortion restriction, or already considered the application of Section 4 and held it "invalid, unconstitutional, or preempted by federal law." *Id.* § 30.022(d)(3). Furthermore, those sued under S.B. 8 who prevail in their case are barred from recovering their costs and attorney's fees even if they prevail "no matter how many times they are sued or the number of courts in which they must defend." (Dkt. 1, at 27) (citing Tex. Health & Safety Code § 171.208(i)).

Under S.B. 8's public enforcement mechanism, state agencies are empowered to bring administrative and civil enforcement actions against medical professionals who participate in abortions that violate the six-week ban based on their state-issued licenses. S.B. 8. Tex. Occ. Code §§ 164.053(a)(1)), 165.101; 243.011–.015, 245.012–.017; 301.10, 553.003, 565.001(a), 565.002. Because subchapter H of S.B. 8, which includes the six-week ban, will be added to Chapter 171 of the Texas Health and Safety Code, violations of the six-week ban trigger enforcement of other provisions of Chapter 171, as well as regulations state agencies have jurisdiction to enforce based on a violation of S.B. 8.

Under the Texas Medical Practice Act, for example, the Texas Medical Board ("TMB") must initiate investigations and disciplinary action against, as well as refuse to issue or renew licenses to, licensed physicians who violate a provision of Chapter 171. *See, e.g.,* Tex. Occ. Code § 164.055(a) (TMB "shall take an appropriate disciplinary action against a physician who violates . . . Chapter 171, Health and Safety Code."); *see id.* (TMB "shall . . . refuse to issue a license or renewal license to a person who violates that . . . chapter."); Tex. Occ. Code § 164.052(a)(5), § 164.001(b)(2)–(3) (TMB, "on determining that a person committed an act described by Sections 164.051 through 164.054, shall enter an order" of discipline, which may include suspension, limitation, or revocation of a physician's license."); Tex. Admin. Code § 176.2(a)(3), 176.8(b) ("TMB must investigate and "shall . . . review the medical competency" of licensees who have been named in three or more [healthcare-related] lawsuits within a five-year period."). The Texas Board of Nursing ("TBN"), Texas Board of Pharmacy ("TBP"), and Health and Human Services Commission ("HHSC") have similar authority to take disciplinary actions against those who violate S.B. 8. Tex. Occ. Code §§ 301.453(a) (TBN "shall enter an order imposing" discipline for violations of the Nursing Practice Act), 301.452(b)(1), 565.001(a), 565.002 (empowering TBP to take disciplinary, administrative or civil action against violators of the Texas Pharmacy Act); Tex. Health & Safety Code §§ 243.011–.015, 245.012–.017

(empowering HHSC to take disciplinary or civil action against licensed abortion facilities and ambulatory surgical centers ("ASC") based on violations of the Medical Practice Act. 25 Tex. Admin. Code §§ 135.4(l) (requiring abortion-providing ASCs to comply with rules for abortion facilities), § 139.60(c), (l); § 217.11(1)(A), 213.33(b) (imposing disciplinary measures for nurses who fail to " conform to . . . all federal, state, or local laws, rules or regulations affecting the nurse's current area of nursing practice.").

## C.  The Parties

### 1. Plaintiffs

Plaintiffs are comprised of those who provide abortion services, the Provider Plaintiffs, and those who support patients in need of an abortion, the Advocate Plaintiffs.

The Provider Plaintiffs[7] include reproductive healthcare providers across the state of Texas, who bring this suit on behalf of themselves, their physicians, nurses, pharmacists, other staff, and patients. (Dkt. 1, at 9–12). All of the Provider Plaintiffs allege that the "vast majority" of the abortions performed in their facilities occur after the six-week ban imposed by S.B. 8. (*See id.*). As such, the Provider Plaintiffs all perform abortions that will be proscribed by S.B. 8 when it takes effect September 1, 2021. (*Id.* at 12). The Provider Plaintiffs allege that if S.B. 8 takes effect, they and their staff will "suffer profound harm to their property, business, reputations, and a deprivation of their own constitutional rights." (*Id.* at 34).

---

[7] The Provider Plaintiffs in this action include Whole Woman's Health, Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services ("Alamo"), Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center ("Austin Women's"), Houston Women's Clinic, Houston Women's Reproductive Services ("HWRS"), Planned Parenthood of Greater Texas Surgical Health Services ("PPGT Surgical Health Services"), Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), Planned Parenthood Center for Choice ("PP Houston"), Southwestern Women's Surgery Center ("Southwestern"), Whole Woman's Health Alliance, Allison Gilbert, M.D., and Bhavik Kumar, M.D. (together, "the Provider Plaintiffs"). (Dkt. 1, at 9–12).

Since many abortions provided by the Provider Plaintiffs occur after six weeks of a patient's LMP, they allege they could not "sustain operations if barred from providing the bulk of their current care." (*Id.* at 32). If the Provider Plaintiffs continued to offer abortions that they believe are constitutionally protected, but are prohibited by S.B. 8, they and their staff will risk private enforcement suits and professional discipline. (*Id.* at 32–33). Provider Plaintiffs further allege that S.B. 8 Section 4's fee-shifting provision impacts their "right to petition the courts and to speak freely" because they may be exposed to "potentially ruinous liability for attorney's fees and costs" as they bring lawsuits to vindicate their constitutional rights. (*Id.* at 33–34).

The Advocate Plaintiffs[8] provide support to those in need of abortions and advocate for reproductive rights within Texas and fear that "because they advocate for abortion patients through activities that may be alleged to aid and abet abortions prohibited by [S.B. 8], [they] face a credible threat of enforcement." (Dkt. 1, at 12–14). The Advocate Plaintiffs allege that if S.B. 8 takes effect September 1, they will be forced to redirect resources to support Texans who need to leave the state to obtain an abortion after 6 weeks LMP. (*Id.* at 34). If the Advocate Plaintiffs continue to support those seeking abortions banned by S.B. 8, they will likely face "enforcement lawsuits for aiding and abetting abortions prohibited by S.B. 8" or "engaging in First Amendment-protected speech and other activity in support of abortion." (*Id.* at 34–35). Specifically, Reverends Forbes and Kanter worry that their efforts to provide spiritual and emotional counseling to "patients and parishioners" will expose them to "costly and burdensome civil lawsuits," and that this risk extends to "other clergy members, counselors, and advisors (such as sexual assault and genetic counselors), as S.B. 8

---

[8] The Advocate Plaintiffs include The Afiya Center, Frontera Fund, Fund Texas Choice, Jane's Due Process, Lilith Fund for Reproductive Equity ("Lilith Fund"), North Texas Equal Access Fund ("TEA Fund"), Marva Sadler, Reverend Daniel Kanter ("Kanter"), and Reverend Erika Forbes ("Forbes"). (together, "the Advocate Plaintiffs."). (Dkt. 1, at 12–14).

incentivizes lawsuits accusing individuals of aiding and abetting prohibited abortions" through generous award of fees to successful claimants. (*Id.*).

2.   Defendants

Defendant the Honorable Austin Reeve Jackson ("Jackson") is the judge for the 114th District Court in Smith County, Texas, a court with jurisdiction over S.B. 8 claims. (Dkt. 1, at 15). Defendant Penny Clarkston ("Clarkston") is the Clerk for the District Court of Smith County and in that role is charged with accepting civil cases for filing and issuing citations for service of process upon the filing of a civil lawsuit. (*Id.*). Both Jackson and Clarkston are sued in their official capacities and as representatives of two putative classes consisting of all state judges and clerks in Texas with the authority to initiate S.B. 8 enforcement actions and exert their coercive power over Plaintiffs to participate in and be sanctioned by S.B. 8 actions. (*Id.* at 15–16; *see also* Mot. Certify Class, Dkt. 32). Defendant Jackson recently participated in a press conference regarding the instant suit, in which he referred to himself as one of "the judges who enforce [S.B. 8] in east Texas." (Aug. 4 Press Conf. Tr., Dkt. 53-1, at 4).

Defendant Stephen Brint Carlton is the Executive Director of the Texas Medical Board ("TMB") and in that capacity serves as the chief executive and administrative officer of TMB. (Dkt. 1, at 16–17) (citing Tex. Occ. Code § 152.051). Defendant Katherine A. Thomas is the Executive Director of the Texas Board of Nursing ("TBN") and in that role performs duties as required by the Nursing Practice Act, and as designated by the TBN. (*Id.* at 17–18) (citing Tex. Occ. Code § 301.101). Defendant Allison Vordenbaumen Benz is the Executive Director of the Texas Board of Pharmacy ("TBP") and in that capacity performs duties under the Texas Pharmacy Act, or designated by the TBP. (*Id.* at 19) (citing Tex. Occ. Code § 553.003). Defendant Cecile Erwin Young is the Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"),

which licenses and regulates abortion facilities and ambulatory surgical centers ("ASCs") operated by Provider Plaintiffs. (*Id.* at 18) (citing Tex. Health & Safety Code §§ 243.011, 245.012).

Defendant Ken Paxton is the Attorney General of Texas. He is empowered to institute an action for a civil penalty against physicians and physician assistants licensed in Texas who are in violation of or threatening to violate any provision of the Medical Practice Act, including provisions triggered by a violation of S.B. 8. (*Id.* at 19–20) (citing Tex. Occ. Code § 165.101).[9]

Defendant Mark Lee Dickson is a resident of Longview, Texas, who serves as the Director of Right to Life East Texas. (Dkt. 1, at 16). Dickson has advocated for the adoption of state and local laws prohibiting abortions and has expressed his intent to bring civil enforcement actions as a private citizen under S.B. 8. (*Id.* at n.4, 33).

## II. LEGAL STANDARDS

### A. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on

---

[9] The "State Agency Defendants" refers to those members of the Texas government authorized to enforce S.B. 8 through existing state laws, regulations, licensing and professional codes, including Stephen Brint Carlton, Executive Director of the Texas Medical Board, Katherine A. Thomas, Executive Director of the Texas Board of Nursing, Allison Vordenbaumen Benz, Executive Director of the Texas Board of Pharmacy, Cecile Erwin Young, Executive Commissioner of the Texas Health and Human Services Commission, and Ken Paxton, Attorney General of Texas.

the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B.  Standing

Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

To establish Article III standing, a plaintiff must demonstrate that she has "(1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 560–61. "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). A plaintiff suffers injury-in-fact for purposes of "bring[ing] a preenforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 160. A credible threat of enforcement exists when it is not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979).

The purpose of these requirements is to ensure that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962) (internal quotation marks removed)). "[I]n the context of injunctive relief, one plaintiff's successful demonstration of standing 'is sufficient to satisfy Article III's case-or-controversy requirement.'" *Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *4 (5th Cir. Sept. 10, 2020) (quoting *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019). Further, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). This is because the injury-in-fact requirement under Article III is qualitative, not quantitative, in nature." *Id.*

## C. Sovereign Immunity

The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). However, under the *Ex parte Young* exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908). Thus, "[t]here are three basic elements of an *Ex parte Young* lawsuit. The suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020).

The Supreme Court has instructed lower courts evaluating whether state officials are subject to suit under the exception to sovereign immunity to conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). If so,

the Court must then examine whether "the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019), *cert. denied sub nom. City of Austin, Texas v. Paxton*, 141 S. Ct. 1047 (2021) (quoting *Young*, 209 U.S. at 157). The Fifth Circuit has not established "a clear test for when a state official is sufficiently connected to the enforcement of a state law so as to be a proper defendant under *Ex parte Young*.". *Texas Democratic Party v. Hughs*, No. 20-50683, 2021 WL 1826760 (5th Cir. May 7, 2021); *City of Austin*, 943 F.3d at 997 ("What constitutes a sufficient connection to enforcement is not clear from our jurisprudence.") (cleaned up).

While "[t]he precise scope of the 'some connection' requirement is still unsettled," the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Texas Democratic Party*, 961 F.3d at 400–01 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). And "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and '[the] *Young* analysis ends.'" *City of Austin*, 943 F.3d at 998). Where, as here, "no state official or agency is named in the statute in question, [the court] consider[s] whether the state official actually has the authority to enforce the challenged law." *Id.*

### III. DEFENDANTS' MOTIONS TO DISMISS

All Defendants filed motions to dismiss Plaintiffs' claims against them on jurisdictional bases. (*See* SAD Mot. Dismiss, Dkt. 48; Jackson Mot. Dismiss, Dkt. 49; Dickson Mot. Dismiss, Dkt. 50; Clarkston Mot. Dismiss, Dkt. 51). The Court will address the motions to dismiss below.

#### A. SAD Motion to Dismiss

Provider Plaintiffs seek relief against the State Agency Defendants ("SAD") based on their authority to enforce other statutes and regulations against licensed abortion facilities, ambulatory

surgical centers, pharmacies, physicians, physician assistants, nurses, and pharmacists that are triggered by a violation of S.B. 8, and their ability to directly enforce Section 4's fee-shifting regime in this or other challenges to S.B. 8's constitutionality. (Compl., Dkt. 1, at 33–34). The SAD moved to dismiss Provider Plaintiffs' claims against them as barred by sovereign immunity and for lack of standing. (*See* SAD Mot. Dismiss, Dkt. 48). Plaintiffs filed a response, (Dkt. 56), and the SAD filed a reply, (Dkt. 63).

### 1. Sovereign Immunity

The SAD argue that Plaintiffs' claims are barred by sovereign immunity and do not fall within the *Ex Parte Young* exception. (Mot. Dismiss, Dkt. 48, at 6). Specifically, the SAD argue that S.B. 8 explicitly precludes enforcement actions to be brought by "an executive or administrative officer or employee of this state" and that any threat that the SAD will seek fees under Section 4 or institute disciplinary actions through the health-related laws and regulations triggered by violations of S.B. 8 are too speculative to establish a "particular duty to enforce the statute in question." (Dkt. 48, at 6) (citing *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

Plaintiffs respond that the SAD are in fact tasked with in enforcement of S.B. 8 and have the requisite connection the law's enforcement against the Provider Plaintiffs because the SAD may seek legal fees under Section 4 and can force them to "comply with the Act by bringing an enforcement action to constrain the Provider Plaintiffs and their physicians, nurses, and pharmacists from violating S.B. 8's restrictions on providing and assisting with abortion." (Pls.' Resp., Dkt. 56, at 14) (citing *K.P. v. LeBlanc ("K.P. I")*, 627 F.3d 115, 124 (5th Cir. 2010)). The Court agrees and finds Plaintiffs' action against the SAD is not barred by sovereign immunity because the SAD's enforcement capacity under S.B. 8 place them within the *Ex Parte Young* exception.

First, the Court finds that S.B. 8's prohibition on direct enforcement of S.B. 8 by state officials does not preclude the SAD's ability to enforce violations of other state laws triggered by a

violation of S.B. 8, such as the Medical Practice Act, Nursing Practice Act, and Pharmacy Act. *See, e.g.,* Tex. Occ. Code §§ 301.453(a); 301.452(b)(1), 565.001(a), 565.002; Tex. Health & Safety Code §§ 243.011–.015, 245.012–.017; Tex. Admin. Code § § 135.4(l), 139.60(c), (l); § 217.11(1)(A), 213.33(b)). The parties quibble about the meaning of S.B. 8's admonition that "[n]o enforcement of this subchapter, and no enforcement of Chapters 19 and 22, Penal Code, in response to violations of this subchapter, may be taken or threatened by this state, a political subdivision, a district or county attorney, or an executive or administrative officer or employee of this state or a political subdivision against any person." S.B. 8 § 3 (to be codified at Tex. Health & Safety Code § 171.207(a)). While the SAD are correct that they are precluded from enforcing S.B. 8 Section 3 through the private enforcement mechanism created under the law, nowhere does S.B. 8 indicate that it refers to the provisions of the Medical Practice Act, Nursing Practice Act, and Pharmacy Act or the State's ability to enforce such provisions under Chapter 171. The Court thus finds that there is no conflict between S.B. 8's prohibition on the SAD's private enforcement of S.B. 8 and the SAD's enforcement authority under existing Texas laws that may be triggered by a violation of S.B. 8. *See City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019), *cert. denied sub nom. City of Austin, Texas v. Paxton*, 141 S. Ct. 1047 (2021) ("direct enforcement of the challenged law. . .not required: actions that constrain[] the plaintiffs [are] sufficient to apply the *Young* exception"); *K.P. v. LeBlanc* ("*K.P. I*"), 627 F.3d 115, 124 (5th Cir. 2010) ("'Enforcement' typically involves compulsion or constraint.")

Second, the Court finds that the SAD have the requisite connection to enforcement and demonstrated willingness the enforce Section 4 and the state laws triggered by S.B. 8 violations so as to bring their conduct within the *Ex Parte Young* exception to sovereign immunity. While the SAD are correct that some of the disciplinary and civil actions triggered violations of Section 3 of S.B. 8 are within the discretion of the SAD to bring, others are mandatory. *Compare* Tex. Occ. Code § 165.001; *see also id.* § 165.101 (attorney general may institute an action for civil penalties against a

16

licensed physician for certain violations); *id.* § 301.501 (Board of Nursing "may impose an administrative penalty"); *id.* § 566.001(1) (same as to Board of Pharmacy); Tex. Health & Safety Code § 245.017 (HHSC "may assess an administrative penalty") *with* Tex. Occ. Code § 164.052(a)(5), § 164.001(b)(2)–(3) (TMB "shall enter an order" disciplining any physician who violate certain provisions of the Texas Medical Act).

Plaintiffs argue that as in *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, where the Fifth Circuit held that *Ex Parte Young* applied to state officials who, though not empowered to directly enforce challenged statute, "obviously constrain[ed]" the plaintiff under the law through administrative proceedings, here the SAD are similarly authorized and mandated to enforce violations of existing Texas laws stemming from a violation of S.B. 8. 51 F.3d 507, 519 (5th Cir. 2017). Similarly, in *K.P. v. LeBlanc* ("*K.P. I*"), the Fifth Circuit found that state agency defendants who reviewed abortion-related claims for medical malpractice coverage fell within the *Ex Parte Young* because their responsibilities under the statute demonstrated that they were "delegated some enforcement authority." 627 F.3d 115, 124 (5th Cir. 2010); *see also Air Evac*, 851 F.3d 518–19 (noting that board members in *K.P.* "had a specific means through which to apply the abortion statute"). The Court agrees and finds that the SAD have "specific means" to directly enforce Section 4 and to enforce Section 3 through disciplinary and civil actions against Provider Plaintiffs. Thus, the SAD's authority to enforce S.B. 8 falls within the *Ex Parte Young* exception to sovereign immunity. *City of Austin*, 943 F.3d at 1000–02 ("Panels in this circuit have defined 'enforcement' as 'typically involv[ing] compulsion or constraint.'"); *Air Evac*, 851 F.3d 518–19.

The parties dispute whether Provider Plaintiffs must demonstrate that the SAD have a "demonstrated willingness" to enforce S.B. 8 in order to bring them within the *Ex Parte Young* exception. (Dkt. 48, at 8; Dkt. 56, at 16). Although it is unclear whether binding Fifth Circuit precedent requires Provider Plaintiffs to show a demonstrated willingness by the SAD to enforce

Sections 3 and 4, the Fifth Circuit has nonetheless cited with approval, though has not fully endorsed, such a requirement. *See City of Austin* 943 F.3d 993, 1000 ("[W]e find that we need not define the outer bounds of this circuit's Ex parte Young analysis today—i.e., whether Attorney General Paxton must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty' to be subject to the exception."); *but see Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (The required "connection" is not "merely the general duty to see that the laws of the state are implemented," but "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.") (quoting *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001)).

The Court finds that the Provider Plaintiffs have sufficiently alleged a demonstrated willingness on the part of the SAD to enforce abortion restrictions through administrative actions and that such actions are likely imminent here. First, the SAD's "longstanding defense of their enforcement authority under other abortion restrictions" demonstrates their willingness to enforce the S.B. 8 to the extent they are empowered to do so. (Dkt. 56, at 18) (citing *In re Abbott*, 956 F.3d 696 (5th Cir. 2020), *vacated as moot by Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) (mem.) (COVID abortion ban); *Whole Woman's Health v. Paxton*, 978 F.3d 896 (5th Cir. 2020), *reh'rg en banc granted, vacated by* 978 F.3d 974 (5th Cir. 2020) (mem.)). Indeed, in *In re Abbott*, the Fifth Circuit noted that the State had "threatened that [the anti-abortion statute] would be enforced" by "health and law enforcement officials"—demonstrating the State's existing intent to enforce abortion restrictions through health officials such as the defendants named here. 956 F.3d at 709. The SAD also have demonstrated their willingness to pursue professional discipline of medical professionals who violate state laws, such as the Texas Medical Practice Act. *See, e.g., Emory v. Texas State Bd. of Med. Examiners*, 748 F.2d 1023, 1025 (5th Cir. 1984) (violation of federal law by plaintiff triggered TMB to "h[o]ld a hearing in [plaintiff's] absence and cancel[] his [medical] license"); *Andrews v.*

*Ballard*, 498 F. Supp. 1038, 1041 (S.D. Tex. 1980). Here, the State's prior demonstrated willingness to enforce anti-abortion laws through health officials and actual use of disciplinary proceedings against medical professionals who violate laws that trigger such discipline is sufficient to establish that the SAD have a demonstrated willingness to enforce S.B. 8 through health officials.

The parties do not dispute that the SAD have the authority to enforce Section 4 but rather dispute whether the SAD have demonstrated a willingness to enforce the provision. *See* S.B. 8 § 4 (adding § 30.022, making Plaintiffs liable for fees to any "public official in this state" who defends a Texas abortion restriction.). The Court rejects the SAD's argument that they have not demonstrated their willingness to enforce Section 4 because they have not yet requested attorney's fees, as it would be impossible for them to have already requested fees in this case or any other one related to S.B. 8 since the law has not yet taken effect. Furthermore, Plaintiffs may bring a pre-enforcement challenge to the SAD's enforcement of the provision where they face a credible threat of enforcement. (Reply, Dkt. 63, at 5–6); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).

Indeed, the Provider Plaintiffs have demonstrated that the SAD have the power to exert "compulsion or constraint" over them in initiating disciplinary or civil proceedings against the Provider Plaintiffs for violations of Texas law triggered by failure to comply with S.B. 8, and as explained above, the SAD have previously defended their authority to enforce abortion restrictions. Because the SAD have demonstrated their willingness to enforce abortion restrictions and may enforce the slew of disciplinary, administrative and civil actions triggered by a violation of S.B. 8's six-week ban, the Provider Plaintiffs have sufficiently alleged that the SAD have more than "some scintilla of 'enforcement'" authority to enforce Sections 3 and 4 of S.B. 8 so as to satisfy *Ex Parte Young*. *City of Austin*, 943 F.3d at 1000–02 ("Panels in this circuit have defined 'enforcement' as 'typically involv[ing] compulsion or constraint.'").

For all these reasons, the Court finds that the SAD's enforcement authority under S.B. 8 places them within the *Ex parte Young* exception to sovereign immunity as to the Provider Plaintiffs' claims against them.

### 2. Standing

The SAD also move to dismiss the Provider Plaintiffs' claims against them for lack of standing. (Dkt. 48, at 9). First, the SAD argue that the Provider Plaintiffs have failed to plead an imminent or ripe injury because their fear of enforcement actions by SAD are "conjectural" at this time since the law has not taken effect. (*Id.* at 11–12). In the absence of a cognizable injury, the SAD's argument goes, Plaintiffs' claims fail for lack of standing, or alternatively, for lack of ripeness. (*Id.* at 11–15). The SAD further argue that the Provider Plaintiffs lack third-party standing to bring claims on behalf of their employees. (*Id.*). The Court will address each of the SAD's standing arguments in turn.

### a. Cognizable injury and Ripeness

The SAD argue that Plaintiffs have not alleged a plausible threat of enforcement of S.B. 8 by the SAD under the statute's public enforcement mechanism or under Section 4. (*Id.* at 12). They rely on essentially the same arguments to suggest that this suit is not ripe since S.B. 8 has not taken effect and, as such, the Provider Plaintiffs have not faced any enforcement actions. (Dkt. 48, at 12–13; Reply, Dkt. 63, at 8).

The SAD first contend that the Provider Plaintiffs' claimed injuries under Section 3 rely on a "chain of contingencies" because any such a disciplinary proceeding by the SAD would first require a violation of S.B. 8 that is reported the applicable state agency, and would then have to decide to investigate the violation and to impose liability on the offender. (Dkt. 48, at 12) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). The SAD further argue that the Provider Plaintiffs' claim is not ripe for the same reason—their purported injury is "contingent on multiple future

events." (*Id.* at 13). The Provider Plaintiffs respond that they have demonstrated an imminent and ripe injury stemming from the potential administrative actions the SAD may initiate against the Provider Plaintiffs. (Dkt. 56, at 20). Because the Provider Plaintiffs provide abortions that will be banned once S.B. 8 takes effect, they will either have to violate S.B. 8 and await disciplinary actions against them by the SAD or cease to provide what they believe to be constitutionally-protected healthcare, causing harm to their patients. (*Id.* at 21). Furthermore, the Provider Plaintiffs assert that they need not wait until S.B. 8 takes effect, violate S.B. 8 by continuing to serve their patients, and then face enforcement actions by the SAD in order to demonstrate an impending injury—especially given that the SAD have not disavowed their ability or intent to enforce S.B. 8 through its public enforcement mechanism. (*Id.* at 21) (citing *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–29 (2007); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008)).

The Provider Plaintiffs further respond that their alleged injuries "are not so contingent" as the SAD suggest because they are required to report healthcare-related lawsuits to licensing authorities and private citizens may file complaints with the relevant disciplinary agencies and have done so in the past. (Dkt. 56, at 22) (Linton Decl., Dkt. 19-6, at 5) ("We thus expect complaints and lawsuits filed against us and the staff if we provide abortions, including permitted abortions, after September 1."); (Ferringno Decl., Dkt. 19-3, at 3–4) ("Plaintiffs…are regularly harassed by anti-abortion vigilantes, who file false complaints with licensing authorities to trigger government investigations."); (Ferrigno Decl., Dkt. 19-3, at 3) ("These protesters have also filed false complaints against our physicians, attempting to provoke an investigation by the Texas Medical Board. We typically have one complaint filed against a physician at each clinic every year."); (Rosenthal Decl., Dkt. 19-9, at 4) ("I understand that my staff and I would risk ruinous licensure consequences, because a violation of SB 8 could also trigger disciplinary action by the Texas Medical and Nursing Board, and that the clinic could likewise potentially lose its license."). Because the Provider Plaintiffs

face a credible threat of enforcement whether they violate S.B. 8 or not beginning September 1, they have alleged a cognizable injury for standing purposes and their Section 3 claims are ripe for resolution.

The Provider Plaintiffs further argue that they have demonstrated standing as to Section 4's fee-shifting provision because they face a credible threat of a future action for fees under S.B. 8, which will immediately chill their First Amendment right to petition the courts to vindicate their constitutional rights. (Dkt. 56, at 19) (citing Gilbert Decl., Dkt. 19-1, at 11) (Section 4 "will chill our ability to bring cases or present claims to vindicate the rights of ourselves and our patients, due to fears that if we are not 100% successful, there will be serious financial consequences."). Plaintiffs correctly point out that while their injury cannot be a byproduct of the current litigation, here the Provider Plaintiffs challenge the constitutionality of the fee-shifting provision itself and the harm it is likely to cause them, even in the instant action. (Dkt. 56, at 19–20) (citing *Diamond v. Charles*, 476 U.S. 54, 70 (1986); *see also Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 341 (5th Cir. 2012).

Members of the Provider Plaintiffs submitted declarations averring that the possibility of fee awards in S.B. 8 cases will have a chilling effect on their ability to engage in constitutionality-protected activity, which is sufficient to establish an impending injury-in-fact for the purposes of standing. (Dkt. 56, at 20); (Lambrecht Decl., Dkt. 19-5, at 12) ("I am also concerned about the impact that S.B. 8. will have on the arguments we bring in litigation [due to] the possibility of huge legal bills . . . every time we bring a claim that is well-founded and in good faith."); (Sadler Decl., Dkt. 19-11) ("S.B. 8's fee-shifting provision could make us liable for costs and attorney's fees in these cases, impairing our ability to use litigation to vindicate our rights and those of our patients."); *Funeral Consumers*, 695 F.3d at 341 ("The interest at issue (mandatory attorneys' fees and costs) is related to this injury-in-fact because the plain language and undisputed purpose of the mandatory

attorneys' fees and costs provision (to discourage potential defendants from violating antitrust laws) helps prevent the violation of the legally protected right.").

Although the SAD emphasize that the Provider Plaintiffs have not identified any fee requests or threats of such a request by the SAD, yet since S.B. 8 does not take effect until September 1, it would be impossible for the Provider Plaintiffs to allege as much. (Dkt. 63, at 7). The SAD also argue that the existence of the present lawsuit indicates that the Provider Plaintiffs' ability to bring lawsuits challenging abortion restrictions will not be chilled by S.B. 8. (*Id.*). That is not a logically sound argument. The Provider Plaintiffs specifically brought this lawsuit prior to S.B. 8 taking effect to prevent such a constitutional violation. (*See* Compl., Dkt. 1, at 46). Furthermore, the Provider Plaintiffs may establish standing in a pre-enforcement suit challenging the constitutionality of a state law by alleging a threat of future enforcement. *See Susan B. Anthony List*, 573 U.S. at 164 (credible threat of future enforcement sufficient to establish standing in pre-enforcement action); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15–16 (2010) (finding standing in a pre-enforcement action). As noted above, the Provider Plaintiffs have demonstrated a credible threat of an impending injury once S.B. 8 takes effect on September 1, and as such have demonstrated that they have standing to challenge Section 4. (*See, e.g.*, Gilbert Decl., Dkt. 19-1, at 11).

### b.   Third-party Standing

The SAD next argue that the Provider Plaintiffs have failed to demonstrate either organizational or third-party standing to bring their claims on behalf of their employees and staff. (Dkt. 48, at 15). As noted above, however, "in the context of injunctive relief, one plaintiff's successful demonstration of standing 'is sufficient to satisfy Article III's case-or-controversy requirement.'" *Tex. Democratic Party*, 2020 WL 5422917, at *4 (5th Cir. Sept. 10, 2020); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014). Here, at

least one of the physician-parties has standing to seek relief against each of the SAD based on their performance of abortions S.B. 8 purports to ban. (*See* Gilbert Decl., Dkt. 19-1, at 1, 10) ("I am also a Staff Physician. . . [b]ecause S.B. 8 allows almost anyone to sue me, Southwestern, and the staff who work with me, I fear that I will be subject to multiple frivolous lawsuits that will take time and emotional energy—and prevent me from providing the care my pregnant patients need."); (Kumar Decl., Dkt. 19-2, at 1, 34) ("I am also a staff physician at Planned Parenthood Center for Choice ("PPCFC"), where I provide abortions."). As such, this Court need not consider the standing of other plaintiffs asserting the same claim for the purposes of issuing injunctive and declaratory relief. *Horne v. Flores*, 557 U.S. 433, 446 (2009); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, n.9 (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing…because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.").

To the extent the Provider Plaintiffs are required to establish third-party standing for the purposes of obtaining injunctive and declaratory relief on behalf of their employees, they have made such a showing because the Provider Plaintiffs have demonstrated that they have a "close relationship" with their employees and there is a "hindrance" in their employees' ability to protect their own rights. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

First, the Provider Plaintiffs argue that under Fifth Circuit precedent, they may bring claims on behalf of their employees because their interests are "fully aligned" in that they "all seek to avoid S.B. 8's devastating penalties, including adverse licensing actions, which will force them to turn away patients and, in many cases, close clinic doors permanently." (Dkt. 56, at 24). While the SAD claim that the Provider Plaintiffs' interests are not sufficiently aligned with their regulated employees because the employees "may not wish to have a federal court hold that the [SAD] must administratively sanction them," the Provider Plaintiffs attached to their response several

24

declarations specifically detailing how their employees' interests are aligned with their own. (Dkt. 63, at 10); (Dkt. 56, at 24) (Lambrecht Decl., Dkt. 19-5, at 8–9) ("Many staff members entered health care because serving patients was their calling. . . . S.B. 8 will prevent PPGTSHS and our dedicated team of medical professionals from fulfilling our mission."); (Miller Decl., Dkt. 19-7, at 6) ("Our physicians and staff will have to choose between subjecting themselves to these lawsuits or turning away the majority of our patients, putting us in an impossible situation.").[10] As such, the Court finds that the Provider Plaintiffs' interests are sufficiently aligned with those of their employees so as to confer third-party standing. *Campbell v. Louisiana*, 523 U.S. 392, 397–98 (1998).

The SAD argue that the Provider Plaintiffs have not demonstrated that their employees face a "hindrance" to their ability to protect their own interests because they have not alleged a First Amendment injury on behalf of their employees. (Dkt. 63, at 9) (quoting *Kowalski*, 543 U.S. 130). The Provider Plaintiffs have provided evidence of the "multiple barriers" that impede their employees from joining this litigation, as they face violence and harassment due to the nature of their work, and as such, do not want their names publicly identified in a lawsuit, which may cause them to be "targeted in costly and abusive S.B. 8 enforcement lawsuits." (Dkt. 56, at 24–25) (citing Lambrecht Decl., Dkt. 19-5, at 8) ("Our staff deal with never-ending harassment from opponents of abortion. They pass through lines of protestors, yelling at them (and at patients), just to do their jobs."); (Linton Decl., Dkt. 19-6, at 6–7) ("Even staff who have no direct role in abortion services

---

[10] *See also* Sadler Decl., Dkt. 19-11, at 6) ("The uncertainty created by S.B. 8 has already had a significant impact on our clinics. Our staff are worried that the clinics will be forced to close and they will be out of a job."); Kumar Decl., Dkt. 19-2, at 12 ("I also worry about the impact that S.B. 8 will have on me as a physician and on my colleagues, including PPCFC's nurses and other staff, without whom I could not provide abortion services to our patients. As in other areas of medicine, these professionals provide several essential aspects of the health care services we provide. We already face harassment because of our jobs."); (Braid Decl., Dkt. 19-8, at 4) ("I am concerned not only about liability for myself and the other physicians, but also Alamo and HWRS and the staff at these clinics."); (Rosenfeld Decl., Dkt. 19-9, at 3–4) ("[I]f we continue to perform abortions prohibited by SB 8, the clinic and I, as well as all of the nurses, medical assistants, receptionists, and other staff that assist with providing, scheduling, billing, and/or counseling for abortion care.").

25

are worried about being named in harassing lawsuits."); (*see id.*) ("Our staff already deal with relentless harassment from abortion opponents, including [opponents] trying to follow staff home. . . . As a result of these threats, and the increasing volume of threats and harassment to abortion providers more broadly—and the increasing severity of threats (including homicide)—we have had to expend more resources ensuring our health centers and staff and patients remain safe."); (Baraza Decl., Dkt. 19-10, at 5–6) ("Our staff are fearful that they will be sued and forced into a Texas court far away from home to defend themselves, and they are frightened that defending these cases will financially ruin them and their families. . . Staff endure endless harassment from opponents of abortion. . . These protestors often video record staff and patients as they enter and exit the health centers, and we worry they are writing down staff license plates and/or other identifying information.").[11] The significant risks of harassment and S.B. 8 enforcement against the Provider Plaintiffs' employees supports a finding they are hindered in their ability to bring claim on their own behalf. *See Campbell*, 523 U.S. at 397–98 (third-party standing existed where "common interest in eliminating discrimination" and party named in lawsuit had "an incentive to serve as an effective advocate" for those not before the court).

The Court thus finds that the Provider Plaintiffs have sufficiently demonstrated that they have a "close" relationship with their employees for the purposes of this lawsuit, and their employees are hindered from bringing these claims themselves due to the rampant harassment and violence they face from anti-abortion opponents as abortion providers.

---

[11] *See also Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333 (M.D. Ala. 2014) (noting the "history of severe violence against abortion providers in Alabama and the surrounding region."); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 982–83 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015) ("One of the most striking aspects of the trial was [abortion provider] plaintiffs' testimony about their personal experiences with harassment and threats" from opponents of abortion.).

### B.  Judicial Defendants' Motions to Dismiss

Defendants Jackson and Clarkston (together, the "Judicial Defendants") also move to dismiss Plaintiffs' claims against them[12] for lack of subject matter jurisdiction. (Jackson Mot. Dismiss, Dkt. 49; Clarkston Mot. Dismiss, Dkt. 51). Plaintiffs filed a consolidated response to the Judicial Defendants' motions to dismiss, (Dkt. 62), and the Judicial Defendants filed replies, (Dkts. 66, 67).

The Court will analyze the Judicial Defendants' motions to dismiss together as they are both members of the state judicial system, and their arguments in support of the motions to dismiss largely overlap. (*See* Jackson Mot. Dismiss, Dkt. 49; Clarkston Mot Dismiss, Dkt. 51). The Judicial Defendants first argue that Plaintiffs' claims against them are not cognizable under Article III because there is no case or controversy since the Judicial Defendants play an adjudicatory role in S.B. 8's enforcement. (Dkt. 49, at 5; Dkt. 51, at 10) (arguing that there is no case or controversy between Plaintiffs and Jackson because he will only act in his "adjudicatory capacity if he presides over a lawsuit brought under S.B. 8."). Second, the Judicial Defendants argue that Plaintiffs lack standing to bring their claims. (Dkt. 49, at 5; Dkt. 51, at 13). Finally, the Judicial Defendants argue that Plaintiffs' claims against them are barred by sovereign immunity. (Dkt. 49, at 6; Dkt. 51, at 22). To the extent Defendant Dickson has offered arguments in support of the Judicial Defendants' motions to dismiss in his own motion that were not raised in the Judicial Defendants' motions, (Dkt. 50, at 16–22), the Court will address them here.

#### 1. Case or controversy

The Judicial Defendants argue that Plaintiffs' claims against them fail to satisfy Article III's case or controversy requirement because "[n]either Judge Jackson nor Ms. Clarkston have a personal

---

[12] Jackson notes that "all the arguments raised in this Motion to Dismiss would apply with equal force to all the other state judges across Texas." (Dkt. 49, at 1).

stake in the outcome of S.B. 8 enforcement suits, neither of them were involved in the statute's enactment, and they are barred by state law from initiating S.B. 8's enforcement in their official capacity." (Dkt. 51, at 11; Dkt. 49, at 4). "The case or controversy requirement of Article III of the Constitution requires a plaintiff to show that he and the defendants have adverse legal interests." *Bauer v. Texas*, 341 F.3d 352, 359 (5th Cir. 2003).

The Judicial Defendants argue that their legal interests are not adverse to those of Plaintiffs' because their role in S.B. 8 enforcement actions is purely related to the adjudication of claims brought under the law. (Dkt. 49, at 4); (Dkt. 51, at 11) (citing *Bauer*, 341 F.3d at 361) ("Section 1983 will not provide any avenue for relief against judges 'acting purely in their adjudicative capacity, any more than, say, a typical state's libel law imposes liability on a postal carrier or telephone company for simply conveying a libelous message.'"); (Dickson Mot. Dismiss, Dkt. 50, at 16–17). [13] The Judicial Defendants further cite to *Chancery Clerk of Chickasaw County v. Wallace* for the proposition that because state judges and clerks have no personal stake in the outcome of S.B. 8 enforcement actions, they lack the requisite adversity to Plaintiffs, who as here, challenge the constitutionality of a state statute. (Dkt. 51, at 11–12); 646 F.2d 151 (5th Cir. 1981). Plaintiffs respond that because Judicial Defendants cannot open or resolve S.B. 8 enforcement actions without violating Plaintiffs' constitutional rights, the Judicial Defendants have demonstrated their personal stake in S.B. 8. (Dkt. 62, at 30–38). And because there are no other governmental authorities tasked with enforcement of S.B. 8, Plaintiffs have demonstrated that their interests are sufficiently adverse to those of the Judicial Defendants so as to present a "case or controversy" under Article III. (*Id.*).

---

[13] Clarkton likens herself to a "postal carrier," arguing that her docketing and issuing of a citation in any S.B. 8 case brought in her district renders her even "less adverse" to Plaintiffs than Jackson. (Dkt. 51, at 11). However, unlike a postal carrier, who merely transmits a message, here Clarkston will exert coercive power over defendants in S.B. 8 actions by issuing citations against them. Tex. R. Civ. P. 99(a).

Initially, the Court notes that Plaintiffs have likely demonstrated that their claims against the Judicial Defendants satisfy Article III's case or controversy requirement because while Judicial Defendants have indicated that they believe they must accept and adjudicate private enforcement actions brought under S.B. 8, Plaintiffs on the other hand claim that any such action would violate their constitutional rights. (Dkt. 62, at 30; Clarkston Mot. Dismiss, Dkt. 51; Jackson Mot. Dismiss, Dkt. 49). *See Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 242 (1937).[14]

Moreover, in contrast to the cases cited by the Judicial Defendants, where the Fifth Circuit found judges to be improper defendants in Section 1983 challenges to state statutes where other government defendants were more properly named, here there are no other government enforcers against whom Plaintiffs may bring a federal suit regarding S.B. 8's constitutionality. While in *Wallace* and *Bauer* the Fifth Circuit found that state judges were not the proper defendants because other state officials were more appropriately named as defendants due to their enforcement activities, here S.B. 8 forecloses Plaintiffs' ability to name anyone in the State's legislature or executive branch in this challenge.[15] *Bauer*, 341 F.3d at 359 ("Our decision today does not foreclose Bauer or others from directly challenging the constitutionality of Texas's guardianship statutes, as it does not reach the question of whether these statutes are constitutional."); *Wallace*, 646 F.2d 151 (allowing plaintiffs to "substitute the proper public officials as defendants" where class of state judges and clerks did not

---

[14] While Jackson insists that this Court must assume that he will "simply interpret and apply the law" in adjudicating cases under S.B. 8, this assertion is belied by Jackson's own statements at an August 4, 2021 press conference indicating that he is not a neutral arbiter because he is "one hundred percent committed to seeing . . . the voice and vote of pro-life Texans defended" regardless of "what some leftist judge down in Austin may do." (Aug. 4 Press Conf. Tr., Dkt. 53-1, at 4).

[15] State Senator Bryan Hughes, a legislative sponsor of S.B. 8 has admitted that the legislature deliberately crafted S.B. 8 to not "require any action by the district attorney, by the state, or any government actor." (Aug. 4 Press Conf. Tr, Dkt. 53-1, at 5). Similarly, Defendant Dickson has noted that S.B. 8 is "very clever" because, like the recent Lubbock, Texas ordinance banning abortions, "[t]here's no way for a court to hear the validity of this law until someone actually brings a civil lawsuit" since "the government can't enforce this law." (Dickson May 5, 2021 Facebook Post, Dkt. 57-1, at 3).

have "the requisite personal stake in defending the state's interests" in Section 1983 suit challenging

state civil commitment procedures).

Furthermore, courts have acknowledged that state judges may be proper defendants in

constitutional challenges to state statutes where, as here, it is not possible to enjoin any "other

parties with the authority to seek relief under the statute." *In re Justices of the Supreme Court of Puerto*

*Rico*, 695 F.2d 17 (1st Cir. 1982). Here, the naming of the Judicial Defendants is "necessary" for

Plaintiffs to seek "full relief" for the alleged violations of their constitutional rights that will occur if

the Judicial Defendants use their authority to force Plaintiffs to participate in S.B. 8 enforcement

actions. *Id.* at 23; *see also Mitchum*, 407 U.S. at 242 ("[F]ederal injunctive relief against a state court

proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss

of a person's constitutional rights.").

Recognizing that their arguments would essentially prohibit Plaintiffs from naming any state

official in a federal lawsuit challenging the constitutionality of a state statute structured like S.B. 8,

the Judicial Defendants suggest that Plaintiffs should instead wait to be sued in state court, and then

raise the defenses available to them under S.B. 8 in such an enforcement action. (Dkt. 51, at 12).

This argument sidesteps the fact that if this Court were to dismiss the Judicial Defendants for lack of

a case or controversy, Plaintiffs would have no avenue to challenge the constitutionality of S.B. 8

outside of an enforcement action brought against them under S.B. 8—an action Plaintiffs allege

would violate their constitutional rights in the first place. (Dkt. 62, at 38). Even within an

enforcement action, Plaintiffs' ability to raise the defense that the law is unconstitutional is severely

limited under S.B. 8's private enforcement mechanism. Tex. Health & Safety Code §§ 171.208(e)(2),

(3), 171.209(b).[16]

---

[16] "Notwithstanding any other law, the following are not a defense to [a S.B. 8 enforcement action]. . . a
defendant's belief that the requirements of this subchapter are unconstitutional or were unconstitutional. . . a
defendant's reliance on any court decision that has been overruled on appeal or by a subsequent court, even if

Although the Judicial Defendants are correct that state courts can consider constitutional issues, the Court finds troubling the Judicial Defendants' suggestion that Plaintiffs should only be allowed to challenge S.B. 8 through the "defenses available to them under the [same] statute" when Plaintiffs' claim is that S.B. 8 cannot be enforced against them at all without violating the Constitution. (Dkt. 51, at 12). Because there are no other state officials against whom Plaintiffs might seek relief in federal court for S.B. 8's alleged constitutional violations and state judicial defendants may be properly named in federal suits seeking equitable relief to vindicate federal constitutional rights, the Court finds that the Judicial Defendants are sufficiently adverse to Plaintiffs in S.B. 8 actions to bring this action within Article III's case or controvert requirement.[17]

Furthermore, the Court finds that the Judicial Defendants play an enforcement role in S.B. 8 and thus are not immune from suit under *Bauer*, which only applies where judges act "purely in their adjudicative capacity." 341 F.3d at 361. Here, in contrast, the Judicial Defendants are "not immune from suits for declaratory or injunctive relief" because S.B. 8 empowers the Judicial Defendants to

---

that court decision had not been overruled when the defendant engaged in conduct that violates this subchapter." Tex. Health & Safety Code §§ 171.208(e)(2), (3).

[17] *See, e.g.*, *WXYZ, Inc. v. Hand*, 658 F.2d 420, 427 (6th Cir. 1981) (affirming issuance of permanent injunction against Michigan state court judge who was required by statute to issue a suppression order in a criminal proceeding that barred media from publishing the defendant's identity); *Caliste v. Cantrell*, Civ. No. 17-6197, 2017 WL 6344152, at *3 (E.D. La. Dec. 12, 2017) (awarding declaratory relief and later entering a consent decree against a magistrate judge of Orleans Parish who under Louisiana state law received a set percentage of any bond amount collected from a for-profit surety for the court's discretionary use and who had an active role in setting bail and managing generated funds), *aff'd*, 937 F.3d 525 (5th Cir. 2019); *Strawser v. Strange*, 100 F. Supp. 3d 1276 (S.D. Ala. 2015) (awarding declaratory and injunctive relief against a defendant class of Alabama probate judges who were directed by Alabama law to refuse to issue marriage licenses to same-sex couples or recognize their out-of-state marriages); *Tesmer v. Granholm*, 114 F. Supp. 2d 603, 616–18, 622 (E.D. Mich. 2000) (awarding declaratory relief initially, and injunctive relief subsequently, against a defendant class of state court judges who were directed by a state statute to deny appellate counsel to indigent criminal defendants who plead guilty), *aff'd in part and rev'd in part on other grounds*, 333 F.3d 683 (6th Cir. 2003) (en banc), *rev'd on other grounds sub nom Kowalski v. Tesmer*, 543 U.S. 125 (2004); *Kendall v. True*, 391 F. Supp. 413, 420 (W.D. Ky. 1975) (awarding declaratory and injunctive relief against a class of county circuit court judges who oversaw civil commitment proceedings pursuant to procedures set forth by Kentucky law); *Blick v. Dudley*, 356 F. Supp. 945, 953–54 (S.D.N.Y. 1973) (awarding injunctive relief against Administrative Judge and Chief Clerk of New York criminal court requiring expungement of all records of plaintiffs' unconstitutional arrests because only the clerks could expunge the records).

take on an enforcement role in the law's application. *LeClerc v. Webb*, 419 F.3d 405, 414 (5th Cir. 2005). Not only are the Judicial Defendants the only state officials tasked with directly enforcing S.B. 8 against Plaintiffs, but Jackson has even publicly stating that he is one of "the judges who enforce [S.B. 8] in east Texas." (Aug. 4 Press Conf. Tr, Dkt. 53-1, at 4). Jackson's statement regarding the enforcement power state courts wield under S.B. 8, coupled with the provisions of S.B. 8 that so obviously skew in favor of claimants, bring this case outside the scope of cases where the Fifth Circuit has found that state judicial officers acted purely in their adjudicatory roles.

For example, while the *Bauer* court found that judges played a purely adjudicatory role in the statute at issue in part because of the "safeguards" built into the statute before a guardianship could be imposed, here S.B. 8 contains no such "safeguards" for defendants in S.B. 8 enforcement actions. 341 F.3d 361. In fact, S.B 8 does just the opposite by purporting to dictate how state courts hear S.B. 8 enforcement actions, including by eliminating non-mutual issue preclusion and claim preclusion, modifying federal constitutional defenses, and prohibiting state courts' ability to rely on non-binding precedent or even assess whether a claimant has been injured[18] by a violation of S.B. 8. *See* S.B. 8 § 5 (to be codified at Tex. Gov. Code § 311.036); Tex. Health & Safety Code §§ 171.209(c), (d)(2)). Because Jackson has declared his enforcement authority under S.B. 8 and the Judicial Defendants play a role in S.B. 8 cases that is more than purely adjudicatory, S.B. 8 renders the Judicial Defendants judicial enforcers of S.B. 8 rather than neutral adjudicators. *Id.*; *see, e.g.,* S.B. 8 § 171.211.

Here, Plaintiffs have alleged that the Judicial Defendants' interests are sufficiently adverse to their own so as to satisfy the case of controversy requirement under Article III.

---

[18] The Court finds it somewhat ironic that Judicial Defendants argue that Plaintiffs cannot show injury-in-fact to support standing to challenge S.B. 8, a law that purports to remove such a requirement from private enforcement proceedings brought under the law.

### 2. Sovereign Immunity

The Judicial Defendants next argue that Plaintiffs' claims against them are barred by sovereign immunity. (Dkt. 49, at 6–8; Dkt. 50, at 17; Dkt. 51, at 22).[19] Jackson contends that while *Ex Parte Young* allows for equitable causes of action to be brought against state officials who act unconstitutionally, "this authority does not include the power to enjoin state courts." (Dkt. 49, at 7) (citing *Ex Parte Young*, 209 U.S. at 163.). Even if injunctive relief were available against state courts, Jackson argues that the lack of sufficient statutory enforcement authority under S.B. 8 excludes him from the *Ex Parte Young* exception. (*Id.* at 8) (citing *City of Austin v. Paxton*, 943 F.3d 993, 1000 (5th Cir. 2019)). Dickson further contends that the Judicial Defendants cannot be sued under *Ex Parte Young* because they have no intent to violate federal law by merely "waiting to see if someone files a lawsuit under Senate Bill 8." (Dkt. 50, at 18). Instead, Dickson argues that Jackson could only be sued under *Ex Parte Young* once he hears an enforcement action under S.B. 8 and "enters an actual ruling that violates someone's federally protected rights." (Dkt. 50, at 19).

Plaintiffs respond that the Judicial Defendants are not entitled to sovereign immunity because they are sued in their official capacities to prevent future actions to enforce an allegedly unconstitutional law. (Dkt. 62, at 28) (citing *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 472–73 & n.22 (5th Cir. 2020); *Warnock v. Pecos Cnty.*, 88 F.3d 341, 343 (5th Cir. 1996) (claims against Texas judges seeking prospective relief against violations of federal law are not barred by sovereign immunity). Indeed, as noted above, forcing Plaintiffs to wait until a state enforcement action is brought against them to raise their constitutional concerns would leave Plaintiffs without the ability to vindicate their constitutional rights in federal court before any constitutional violation

---

[19] Clarkston argues that she is also entitled to sovereign immunity by adopting the arguments of her co-Defendants without further elaboration. (Dkt. 51, at 22) ("Ms. Clarkston is entitled to sovereign immunity for the same reasons as Judge Jackson, and Judge Jackson's and Defendant Mark Lee Dickson's arguments as to sovereign immunity are incorporated herein.").

occurs. *Supreme Ct. of Virginia v. Consumers Union of U.S.*, Inc., 446 U.S. 719, 737 (1980) (reasoning

that state court and chief justice were proper defendants in Section 1983 challenge to state's

disciplinary rules because otherwise "putative plaintiffs would have to await the institution of state-

court proceedings against them in order to assert their federal constitutional claims.").

Plaintiffs further point out that under more recent precedent than that cited by Judicial

Defendants, the Fifth Circuit has found that the availability of relief under *Ex Parte Young*, which

"allows plaintiff[s] to sue a state official, in his official capacity, in seeking to enjoin enforcement of a

state law that conflicts with federal law," may apply to Section 1983 challenges against state judicial

actors who play a role in enforcing state statutes, even through ministerial duties. (Dkt. 62, at 42–43)

(citing *Air Evac EMS*, 851 F.3d at 515; *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997);

*Green Valley*, 969 F.3d at 473 n.22; *Finberg*, 634 F.2d at 54 ("[C]ourts often have allowed suits to

enjoin the performance of ministerial duties in connection with allegedly unconstitutional laws.");

*Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 735.

For example, in *Supreme Ct. of Virginia*, a Virginia court and its chief justice were found to not

be immune from claims brought under Section 1983 because of the court's "own inherent and

statutory enforcement powers" with regard to state bar disciplinary rules. 446 U.S. 719, 735. In fact,

Section 1983 was designed to allow individuals to challenge unconstitutional actions by members of

state government, whether they be part of the "executive, legislative, or judicial" branches of that

state government. *Mitchum*, 407 U.S. at 242 (emphasis added) (quoting *Ex parte Virginia*, 100 U.S. at

346). In 1996, Congress even amended Section 1983 to make clear that an action brought seeking

declaratory relief may be "brought against a judicial officer for an act or omission taken in such

officer's judicial capacity," and injunctive relief may be brought against a judicial officer who violates

a declaratory decree or against whom declaratory relief is not available. 42 U.S.C. § 1983; *see also*

*Pulliam v. Allen*, 466 U.S. 522, 540 (1984) (noting that Congress enacted Section 1983 in part because

"state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights.").

Here, as noted above, the Judicial Defendants' enforcement role in S.B. 8's private enforcement mechanism brings them within the carveouts courts have created to allow Section 1983 challenges to laws to proceed against state court officials under the *Ex Parte Young* exception to sovereign immunity. Plaintiffs' claims are thus not barred by sovereign immunity.

### 3. Standing

The Judicial Defendants next challenge Plaintiffs' standing to bring their claims, arguing that Plaintiffs have failed to meet the standing requirements of injury-in-fact, traceability, and redressability. While the Judicial Defendants argue that Plaintiffs have failed to meet any of these standing requirements, (Dkt. 49, at 5–6; Dkt. 51, at 13), Plaintiffs contend that they have met all standing criteria as to their claims against the Judicial Defendants. (Dkt. 62, at 16).

### a.  Injury-in-fact

The Judicial Defendants first argue that Plaintiffs cannot show an impending injury-in-fact because there is no immediate threat of enforcement actions. (Dkt. 51, at 14). The Judicial Defendants emphasize that there "are no currently pending actions under S.B. 8," and of course, there could not be since the law does not take effect until September 1. (Dkt. 51, at 14–15). Dickson once again argues that since Plaintiffs have not specifically alleged that they plan to violate S.B. 8 or identified who would bring an enforcement action against them for such a violation apart from Dickson, their threatened injury constitutes "rank speculation." (Dkt. 50, at 20–21). However, as explained above, there need not be a pending enforcement action against Plaintiffs to confer Plaintiffs standing over claims alleging imminent constitutional harm once S.B. 8 takes effect. *See* Section A(2)(a); *See, e.g.*, *Babbitt*, 442 U.S. 289, 298; *Susan B. Anthony List*, 573 U.S. at 158.

Furthermore, contrary to Defendant Dickson's contention that Plaintiffs must specifically allege that they intend to violate S.B. 8, such as admission is not in fact required to demonstrate an injury-in-fact for standing purposes. *SBA List*, 573 U.S. at 163; *MedImmune*, 549 U.S. at 129.

Even if required to allege an intent to violate S.B. 8, Plaintiffs have stated that they provide abortions that would violate the six-week ban and "desire to continue to" provide the medical care and other forms of support banned by S.B. 8. (Compl., Dkt. 1, at 9–12, 32). As such, Plaintiffs argue, the threat of lawsuits stemming from enforcement actions brought by private citizens in Judicial Defendants' courts is an injury-in-fact sufficient to confer Article III standing. (Dkt. 62, at 17); *K.P. v. LeBlanc* ("*K.P. I*"), 627 F.3d 115, 123 (5th Cir. 2010) (injury established where "probability of future suits" meant it was "sufficiently likely that the physicians will face liability for abortion-related procedures."). Indeed, the threat of enforcement actions is not "imaginary or wholly speculative" given that S.B. 8 specifically targets Plaintiffs by making their primary activities subject to enforcement actions before Judicial Defendants. (Dkt. 62, at 17); *SBA List*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 302). In addition, Plaintiffs contend that having to defend themselves in S.B. 8 enforcement actions is an injury in and of itself. (Dkt. 62, at 6–8, 18).

In response to Dickson's suggestion that Plaintiffs alleged injuries are speculative because they have not identified who will bring enforcement actions, Plaintiffs identify the Texas Right to Life's statement that it is actively "encouraging individuals to sue abortion providers and abortion funds." (Dkt. 62, at 18) (citing Seago Decl., Dkt. 50-2, at 1). Furthermore, Plaintiffs note that last year Dickson's own counsel filed eight lawsuits[20] in just one day against some of the Plaintiffs in this

---

[20] *Blackwell v. The Lilith Fund for Reprod. Equity*, No. 2020-147 (Tex. Dist. Ct. Rusk Cnty., filed July 16, 2020); *Byrn v. The Lilith Fund for Reprod. Equity*, No. 12184-D (Tex. Dist. Ct. Taylor Cnty., filed July 16, 2020); *Enge v. The Lilith Fund for Reprod. Equity*, No. 20-1581-C (Tex. Dist. Ct. Smith Cnty., filed July 16, 2020); *Gentry v. The Lilith Fund for Reprod. Equity*, No. CV2045746 (Tex. Dist. Ct. Eastland Cnty., filed July 17, 2020); *Maxwell v. The Lilith Fund for Reprod. Equity*, No. C 2020135 (Tex. Dist. Ct. Hood Cnty., filed July 16, 2020); *Moore v. The Lilith Fund for Reprod. Equity*, No. 2020-216 (Tex. Dist. Ct. Panola Cnty., filed July 16, 2020); *Morris v. The Lilith*

lawsuit in counties across Texas, including Smith County where the Judicial Defendants are located—suggesting that it is far from speculative to assume that those intending to file S.B. 8 actions will do so in as many Texas counties as possible. (Dkt. 62, at 18–19).

The fact that S.B. 8 empowers "any person" to initiate enforcement actions bolsters the credibility of Plaintiffs' alleged harm as those who are politically opposed to Plaintiffs are empowered to sue them for substantial monetary gain. (Dkt. 62, at 19) (citing *Susan B. Anthony List*, 573 U.S. at 156). Indeed, S.B. 8 incentivizes anti-abortion advocates to bring as many lawsuits against Plaintiffs as possible by awarding private enforcers of the law $10,000 per banned abortion. Tex. Health & Safety Code § 171.208(b). Furthermore, Defendants themselves have confirmed the immediacy of the threat of S.B. 8 enforcement actions in state courts. (Seago Decl., Dkt. 50-2, at 1) ("I have personal knowledge that there are several individuals who intend to sue the abortion-provider plaintiffs and the abortion-fund plaintiffs if they defy Senate Bill 8."); Dickson Decl., Dkt. 50-1, at 2–3) ("I have personal knowledge that there are many other individuals who intend to sue the abortion-provider plaintiffs and the abortion-fund plaintiffs if they defy Senate Bill 8. . ."). Given that Plaintiffs have demonstrated that the threat of enforcement actions under S.B. 8 is credible and imminent, the Court finds that they have sufficiently demonstrated an injury-in-fact for the purposes of establishing standing to bring their claims against the Judicial Defendants.

### b.   Causation

The Judicial Defendants next argue that Plaintiffs lack standing because they cannot show that their alleged injuries are traceable to Judicial Defendants since S.B. 8 specifically empowers private citizens, rather than any member of the State, to enforce its provisions. (Dkt. 51, at 16–18). Clarkston cites to *Okpalobi v. Foster*, 244 F.3d 405, 426–27 (5th Cir. 2001) (en banc), and *K.P. v.*

---

*Fund for Reprod. Equity*, No. 200726270 (Tex. Dist. Ct. Hockley Cnty., filed July 16, 2020); *Stephens v. The Lilith Fund for Reprod. Equity*, No. 12678 (Tex. Dist. Ct. Franklin Cnty., filed July 16, 2020).

*LeBlanc ("K. P. II")*, 729 F.3d 427, 437 (5th Cir. 2013), for the proposition that any injury to Plaintiffs caused by S.B. 8 enforcement actions is not fairly traceable to the Judicial Defendants because S.B. 8 statutorily tasks private citizens, rather than state officials, to enforce the six-week ban and fee-shifting provisions. (Dkt. 51, at 17–22; Dkt. 50, at 21–22). Jackson argues that Plaintiffs' injuries are likewise not traceable to him since he has no authority to prevent a private plaintiff from bringing a cause of action under S.B. 8. (Dkt. 49, at 6). Dickson echoes the Judicial Defendants' arguments regarding causation, arguing that since he is "legally incapable" of bringing an enforcement action in Smith County since he is not a resident there, Plaintiffs' alleged injuries are only "fairly traceable" to independent actors not before the Court. (Dkt. 50, at 21–22).

Plaintiffs respond that their impending injuries are in fact traceable to the Judicial Defendants because although only private parties may initiate the civil enforcement actions, the Judicial Defendants actions will exert coercive authority over Plaintiffs by "forcing them into unconstitutional enforcement actions" that "will drain Plaintiffs' resources and potentially force them to close their doors, regardless of whether the enforcement actions are ultimately successful." (Dkt. 62, at 22–23; Compl., Dkt. 1, at 32, 35); *see also Strickland v. Alexander*, 772 F.3d 876, 885–86 (11th Cir. 2014*) (*injury imposed on plaintiff through garnishment proceeding fairly traceable to court clerk who performed "ministerial" duties in "docketing the garnishment affidavit [and] issuing the summons of garnishment"); *De Leon v. Perry*, 975 F. Supp. 2d 632, 646 (W.D. Tex. 2014).

Plaintiffs further point out that absent relief from this Court, the Judicial Defendants will take coercive actions to enforce S.B. 8 against them when private civil suits are filed in their courts. (Dkt. 62, at 22–23). For example, Defendant Clarkston has stated that she will docket cases and issue citations filed under S.B. 8 as is required by her under state law. (Dkt. 62, at 22) (citing Tex. R. Civ. P. 99(a) ("Upon the filing of the petition, the clerk . . . shall forthwith issue a citation[.]"). Similarly, the proposed defendant class of judges are charged with imposing sanctions under S.B. 8

that include injunctive relief and monetary penalties, which Plaintiffs similarly argue are coercive enforcement actions by the State that will at least in part cause Plaintiffs' alleged injuries. (Dkt. 62, at 23) (citing S.B. 8 § 171.208(b) (judges in enforcement proceedings "shall award" "injunctive relief sufficient to prevent" future violations, as well as monetary penalties of "not less than $10,000 for each abortion" performed in violation of S.B. 8 and "costs and attorney's fees.").

Plaintiffs also contend that the involvement of private parties in the enforcement of S.B. 8 does not negate the role the Judicial Defendants will play in causing Plaintiffs' forecasted injuries because the Judicial Defendants' "state-law duty to act on enforcement petitions submitted to them makes them part of the injurious causal chain." (Dkt. 62, at 23) (citing *K.P. I*, 627 F.3d at 122–23; *Okpalobi*, 244 F.3d at 426). Indeed, while only private individuals can file enforcement actions under S.B. 8, it is only the Judicial Defendants who will exercise their coercive power on behalf of the State to force Plaintiffs to participate in lawsuits they believe to be unconstitutional. (Dkt. 62, at 24) (citing *Strickland*, 772 F.3d at 886). The Judicial Defendants need not be the sole cause of Plaintiffs' alleged injuries nor do they need to be involved in every step of the causal chain to properly establish causation. Instead, Judicial Defendants need only be "among those who would contribute to Plaintiffs' harm," and here the alleged harms to Plaintiffs could not occur absent the clerks' involvement. *K.P. I.*, 627 F.3d at 123; *Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018) ("Even if the administrators were only implementing the consequences of others' actions—that is, [plaintiff]'s expulsion by the legislature—[plaintiff] still has standing to sue the administrators for their actions in carrying out those consequences."); *Strickland*, 772 F.3d 886. Here, the Judicial Defendants are integral in executing S.B. 8 enforcement measures by coercing Plaintiffs to participate in such suits and issuing relief against those who violate S.B. 8. (Dkt. 62, at 24). Indeed, the Judicial Defendants may be one of many individuals who may cause harm to Plaintiffs through S.B. 8, but that does negate their role in causing the injuries Plaintiffs have alleged. *Mitchum v. Foster*, 407 U.S. 225, 242

(1972) (federal actions against state judges are particularly appropriate where risk of "great, immediate, and irreparable loss of a person's constitutional rights.").

Because Plaintiffs have alleged that Judicial Defendants will contribute to their injuries by exercising coercive power over them in S.B. 8's private enforcement suits, Plaintiffs have sufficiently alleged that their injuries are traceable to Judicial Defendants so as to support a finding of standing.

c.   Redressability

The Judicial Defendants further argue that any declaratory relief issued by this Court would not redress the harm to Plaintiffs because they do not have the power to reject or refuse to adjudicate lawsuits. (Dkt. 51, at 21). Clarkston suggests that any order from this Court requiring her to decline to docket cases brought under S.B. 8 would require her to "exceed her responsibilities as an elected official under state law" to "evaluate the legal basis for *every single case* filed in Smith County." (Dkt. 51, at 20). Because Clarkston is charged under state law with filing any lawsuit initiated in Smith County, she argues that any order from this Court declaring S.B. 8 unenforceable in state courts would force her to violate state law and threaten the principles of federalism. (Dkt. 51, at 20–21).

Plaintiffs respond that their injuries are in fact redressable by an order from this Court enjoining the Judicial Defendants from initiating or adjudicating private enforcement actions under S.B. 8. (Dkt. 62, at 26). For example, Plaintiffs argue that an order enjoining the proposed class of clerks from docketing or issuing citations for any petitions for enforcement brought under S.B. 8 would help redress Plaintiffs' injuries by preventing them from being forced to participate in a state court proceeding initiated under an allegedly unconstitutional law. (Dkt. 62, at 26).[21] In addition,

---

[21] *See, e.g., Air Evac EMS*, 851 F.3d at 514 (injunction against the state defendants involved in causing the plaintiffs' injuries "would remove a 'discrete injury' caused by state defendants' enforcement"); *Strickland*, 772 F.3d at 886 (injury could be redressed if the court were to "declare the Georgia garnishment process unconstitutional or enjoin any future similar actions that lacked adequate due process protections"); *Durham*, 905 F.3d at 434 ("[W]ere the district court to order the administrators to pay him those benefits, as requested

Plaintiffs argue that an order declaring S.B. 8 unconstitutional would deter private parties from bringing enforcement actions under the law in the first place and would presumably preclude Judicial Defendants from adjudicating lawsuits under a law declared unconstitutional. (Dkt. 62, at 27). Indeed, in *Roe v. Wade*, the Supreme Court issued only declaratory relief under the assumption that "Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional." 410 U.S. 113, 166 (1973). The Court assumes any declaratory relief issued in this case would have the same impact on Judicial Defendants here.

Clarkston asserts that this Court cannot redress Plaintiffs' alleged harm because any injunction would force her to violate her state law duty to docket cases filed in her county. (Dkt. 51, at 19–20). Yet Clarkston's state law duty to docket petitions and issue citations cannot trump her duty to act according to the Constitution, and in any event, an order from this Court would require her to "do nothing more than uphold federal law." *Air Evac EMS*, 851 F.3d at 516. To the extent her duty to act in accordance with the U.S. Constitution conflicts with her duties to docket petitions and issue citations under state law, her state law duties must yield to federal law. *Aldridge v. Mississippi Dep't of Corr.*, 990 F.3d 868, 874 (5th Cir. 2021) ("[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.") (internal citations removed). Contrary to Clarkston's position that upholding the Constitution would present a federalism issue, state officials are never absolved from violating the Constitution merely because their state-mandated duties require them to act in an unconstitutional manner. *Nashville Cmty. Bail Fund v. Gentry*, 446 F. Supp. 3d 282, 301 (M.D. Tenn. 2020). The Court further rejects Clarkston's argument that she is incapable as a non-lawyer of identifying petitions brought under S.B. 8—even if she were incapable of reading a petition to identify whether it was brought under S.B. 8, she may

---

by the complaint, that remedy would redress Durham's claimed injury."); *Kitchen v. Herbert*, 755 F.3d 1193, 1201–02 (10th Cir. 2014) (injuries caused by the clerk "would be cured by an injunction prohibiting the enforcement of Amendment 3").

obtain guidance from the state attorney general with regard to how to implement any injunction from this Court. *See Campaign for S. Equal. v. Bryant*, 197 F. Supp. 3d 905, 909 (S.D. Miss. 2016).

Clarkston relies on *Okpalobi* to support her argument that Plaintiffs do not have standing to sue public officials in challenges to laws that create private rights of actions against abortion providers. 244 F.3d at 426–27. In *Okpalobi*, the Fifth Circuit found that there was no "case or controversy" between the plaintiff abortion providers and the Louisiana government and attorney general in a suit challenging the constitutionality of a statute creating tort liability against physicians who provide abortions because the governor and attorney general played no role in the private tort lawsuits. 244 F.3d at 409, 429. Clarkston also relies on *K.P. II*, where the Fifth Circuit held that the same abortion providers could not challenge the same law by suing members of the oversight board that reviewed patient tort claims to determine whether they would be covered by a medical-malpractice fund because the board was not charged with enforcing the tort actions. 729 F.3d at 437. Here, in contrast, the Judicial Defendants are involved in the S.B. 8 private enforcement actions in a way that none of the defendants in *Okapalobi* and *K.P. II* were so as to support causation for the purposes of standing, and the absence of other appropriate state official defendants means the Judicial Defendants are the only state officials against whom relief from this Court might redress Plaintiffs' alleged injuries.

In addition, Plaintiffs point out that in *K.P. I*, the Fifth Circuit found that abortion providers had standing to sue members of an oversight board in a challenge against the same tort liability provisions because under the statute the board could deny plaintiffs state-sponsored medical malpractice coverage. 627 F.3d 115 (5th Cir. 2010). The Fifth Circuit found that causation was satisfied because the board members, although unable to bring tort claims under the Louisiana law, had the "authority to disburse or withhold the benefits associated with Fund membership." *Id.* Here, Judicial Defendants "wield influence at multiple points in the" enforcement of S.B. 8, and

declaratory relief defining their constitutional obligations with respect to Plaintiffs would serve to redress Plaintiffs' alleged harm. *Air Evac*, 851 F.3d at 515–6. Accordingly, Plaintiffs have established the requisite causal connection between their alleged harm and the Judicial Defendants because the Judicial Defendants have coercive power over Plaintiffs in S.B. 8 enforcement actions.

Furthermore, the Court once again notes that the Fifth Circuit has never stated that there is no proper defendant in challenges to anti-abortion laws that create private rights of action, but rather that the defendants named in previous lawsuits were not properly named due to their lack of enforcement power. See *K.P. I*, 627 F.3d at 124; *Wallace*, 646 F.2d 160. The Court thus does not read these cases to say that Plaintiffs cannot name any state official whatsoever in their suit, as suggested by the Judicial Defendants here. Such a finding would countenance any stratagem to relegate enforcement of state laws to judges so as to avoid federal court review of unconstitutional state statutes. As such, absent guidance from the Fifth Circuit or the State regarding who would be the proper government defendant in a lawsuit challenging the constitutionality of a state statute primarily enforced through a private actors, the Court must find that the Judicial Defendants are the proper defendants here. To find otherwise would be to tell Plaintiffs that there is no state official against whom they may bring a challenge in federal court to vindicate their constitutional rights.

d.   Prudential Standing

Clarkston further argues that even if Plaintiffs have demonstrated the three elements of standing, Plaintiffs' request for declaratory relief against the Judicial Defendants would be improper for "prudential standing considerations" because any such relief would "impermissibly monitor the operation of state court functions." (Dkt. 51, at 15–16) (citing *Bauer*, 341 F.3d at 358). However, rather than serve to "monitor" the operation of state courts, any order from this Court would serve to clarify the Judicial Defendants' constitutional duties with regard to S.B. 8 and avoid violating Plaintiffs' constitutional rights through their adjudication of enforcement actions under S.B. 8.

Plaintiffs rightly argue that all state statutes must be enforced through some form of State coercion, whether through "its legislative, its executive, or its judicial authorities." (Dkt. 62, at 11) (citing *Shelley v. Kraemer*, 334 U.S. 1, 14 (quoting *Ex parte Virginia*, 100 U.S. 339, 347 (1880)). Because the State has crafted S.B. 8 in such a way as to purposefully avoid enforcement by the legislative or executive branches of the government, the only State authority able to enforce the law are members of the proposed classes of Judicial Defendants who "exert their official power to open the actions in the docket and issue citations compelling those sued under S.B. 8 to respond to the lawsuit" or "exert the compulsive power of the state to force those sued under S.B. 8 to comply with the statute through an injunction and other penalties." (Dkt. 62, at 12) (citing S.B. 8 § 171.208(a)–(b)). As such, Plaintiffs argue that the proposed classes of Judicial Defendants are "the lone government officials responsible for directly coercing compliance with S.B. 8" and thus are the proper State defendants in this action. (Dkt. 62, at 12).

The Court agrees that absent further instruction from the State or the Fifth Circuit regarding who would be the proper the defendant in this pre-enforcement suit for equitable relief, the Court finds that Supreme Court precedent dictates that the Judicial Defendants are the proper defendants. *Shelley v. Kraemer*, 334 U.S. 1. Indeed, the Judicial Defendants are the only members of the State immediately connected with the enforcement of S.B. 8 and an order from this Court precluding them from instituting or adjudicating private enforcement actions under S.B. 8 would serve the redress Plaintiffs' alleged harm. Indeed, the correct answer cannot be that "there is *no one* [from the State] who can be sued to block enforcement" of S.B. 8 merely because the law was drafted to avoid federal review of its constitutionality. (Dkt. 62, at 14).

### C. Dickson Motion to Dismiss

Dickson similarly moves to dismiss Plaintiffs' claims against him because S.B. 8's severability provision requires Plaintiffs to establish standing as to every provision of S.B. 8 and that, in any

event, Plaintiffs have failed to meet show an injury-in-fact traceable to him under S.B. 8's private enforcement mechanism. (*See* Dickson Mot. Dismiss, Dkt. 50). Plaintiffs filed a response, (Dkt. 57), and Dickson filed a reply. (Dkt. 64).

### 1. Severability

Dickson argues that because S.B. 8 contains severability provisions, Plaintiffs must allege an injury with regard to each provision of the law to establish standing over their claims against him. (Dkt. 50, at 7–10) (citing Senate Bill 8, 87th Leg., §§ 3, 5, 10)). Because certain provisions of S.B. 8 are not enforced by private citizens, Dickson's argument goes, Plaintiffs lack standing to challenge those provisions as against him. (Dkt. 50, at 9). According to Dickson, Plaintiffs only have standing in connection with Sections 3 and 4 of S.B. 8, which empower private citizens to bring lawsuits and recover attorney's fees against those who participate in abortions the law purports to ban. (*Id.*) ("Only sections 3 and 4 of the statute can be "enforced" by private citizens such as Mr. Dickson in civil litigation—and those are the *only* provisions in Senate Bill 8 that the plaintiffs can conceivably challenge in a lawsuit against Mr. Dickson.").

Yet as Plaintiffs point out, the issue of "severability is a question of remedy, [to be] considered only after a legal violation has been established on the merits." (Dkt. 57, at 24) (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)). Despite his insistence that Plaintiffs cannot have standing with regard to each provision they challenge "unless it applies the statute's severability requirements," Dickson cites to authority stating that severability and standing are not to be analyzed together. (Dkt. 50, at 8) (citing *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019). Indeed, in *Gee*, the Court assessed standing and severability separately, stating that "[s]everability obviously governs the remedy after the finding of a constitutional violation; it plays no part in finding a constitutional violation." *Gee*, 941 F.3d at 173; *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. at 328–29.

To the extent Dickson argues that Plaintiffs must demonstrate standing for "each and every provision they challenge," Plaintiffs have met this burden by showing they have standing as to Sections 3 and 4, the only sections Plaintiffs challenge as against Dickson. (Compl., Dkt. 1, at 46); *Gee*, 941 F.3d at 160. The Court rejects Dickson's argument that Plaintiffs must establish standing as to provisions of S.B. 8 that they do not challenge as against Dickson to sustain their claims against him. Because the Court properly addresses severability after a constitutional violation has been found, the Court need not assess S.B. 8's severability provisions at this time. *Gee*, 941 F.3d at 173. Moreover, the Court notes that severability provisions do not necessarily preclude a finding that, if Section 3's six-week ban on abortions is found to be unconstitutional, other provisions of the law found to be "mutually dependent" on the provisions challenged here also would be unconstitutional. *See SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 472 F. Supp. 3d 1297, 1324 (N.D. Ga. 2020) (remaining provisions of Georgia abortion law with severability provision invalid where "mutually dependent" on section found unconstitutional).

## 2. *Standing*

Dickson next claims that Plaintiffs have no standing to bring their claims against him because they have not demonstrated an impending injury-in-fact traceable to Dickson that could be redressed by an injunction against him. (Dkt. 50, at 10–16).

Dickson first argues that he has "no intention" of suing Plaintiffs under Section 3 of S.B. 8 because "he is expecting each of the plaintiffs to comply with the statute rather than expose themselves to private civil-enforcement lawsuits." (Dkt. 50, at 10). Dickson emphasizes that Plaintiffs have not indicated whether they intend to violate S.B. 8 when it takes effect, apparently under the impression that Plaintiffs must "specifically allege" their intent to violate S.B. 8 in order to establish standing. (Dkt. 50, at 11–12). As such, Dickson argues that there is no impending injury

traceable to him or adversity between the parties as required to support standing or meet the "case or controversy" requirement under Article III. (Dkt. 50, at 11).

Plaintiffs respond that they need not specifically allege that they plan to violate S.B. 8 to establish standing and, in any event, have demonstrated a credible threat of enforcement by Dickson. (Dkt. 57, at 13–14). Plaintiffs are correct that they need not allege they intent to violate a challenged statute to confer standing. Indeed, the Supreme Court has repeatedly stated that plaintiffs need not plead that they plan to violate a law to have standing to challenge its constitutionality. *SBA List*, 573 U.S. at 163 ("Nothing in [the Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15–16 (2010) (finding standing in a pre-enforcement action based on plaintiffs' allegation that "they would provide similar support [to groups designated as terrorist organizations] again if the statute's allegedly unconstitutional bar were lifted"); *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009). Dickson has cited no contrary authority, and the Court thus rejects his argument that Plaintiffs have failed to properly allege an injury-in-fact against him by not admitting that they will violate S.B. 8 after September 1.

Additionally, Dickson has demonstrated his intent to enforce S.B. 8 if Plaintiffs violate the law. (Dickson Decl., Dkt. 50-1, at 1) (admitting that he "expect[s] that the mere threat of civil lawsuits under section 171.208 will be enough to induce compliance" with S.B. 8 by Plaintiffs"); (Dickson Mar. 29, 2021 Facebook Post, Dkt. 57-2, at 7) ("[B]ecause of [S.B. 8] you will be able to bring many lawsuits later this year against any abortionists who are in violation of this bill. Let me know if you are looking for an attorney to represent you if you choose to do so. Will be glad to recommend some."); *id.* at 4 (stating with respect to the then-pending S.B. 8 that "because of this bill you will be able to bring many lawsuits later this year against any at WWH [i.e., Plaintiff Whole Woman's Health] who are in violation of this law"); (Dickson May 5, 2021 Facebook Post, Dkt. 57-

1, at 4) ("The Heartbeat Bill is being said to make everyone in Texas an attorney general going after abortionists."). Based on Dickson's statements regarding his intent to participate in the private enforcement of Section 3 should Plaintiffs continue to provide the banned abortions after September 1, the Court finds that Plaintiffs have sufficiently alleged "a significant possibility of future harm" in the form of an enforcement action by Dickson under Section 3 to support their standing against him. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019).

Dickson also argues that any alleged injury to Plaintiffs caused by S.B. 8's Section 3 cannot be redressed by this Court because even if Dickson is enjoined from bringing an enforcement action, there are "countless others" who would bring enforcement actions under S.B. 8. (Dkt. 50, at 13–14). As Plaintiffs point out, however, because an order preventing "these [private] penalties and lawsuits" by Dickson would alleviate "a discrete injury" to Plaintiffs, Plaintiffs have sufficiently demonstrated standing as to Dickson. (Dkt. 57, at 17) (citing *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 159 (5th Cir. 2007); *see also Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) ("[P]laintiff need not show that a favorable decision will relieve his every injury.'"). Indeed, Plaintiffs have alleged that an injunction preventing Dickson from bringing enforcement actions under S.B. 8 would redress their injuries, at least in part, by preventing Dickson from "suing and imposing significant litigation costs on Plaintiffs." (Dkt. 57, at 16). Moreover, any injunction by this Court would serve as a "strong deterrent" to other individuals contemplating bringing enforcement actions under S.B. 8 and allow defendants in S.B. 8 proceedings in state court to bring counterclaims under Section 1983. (Dkt. 57, at 18). Preventing Dickson and discouraging others from filing S.B. 8 enforcement actions would also prevent the discrete harm of forcing Plaintiffs to shut down completely to comply with S.B. 8. (*Id.* at 16–17).

Dickson similarly argues that Plaintiffs alleged injury under Section 4 is too "conjectural" to confer standing because he has not been deemed a "prevailing party" in any relevant lawsuit and

Plaintiffs do not allege that he will be a prevailing party in this lawsuit. (Dkt. 50, at 14–15). Dickson further contends that if he does prevail in this litigation, he intends to recover his attorney's fees under 42 U.S.C. § 1988(b), rather than under Section 4, and as such "currently" has no intention of enforcing Section 4. (Dkt. 50, at 14–15) ("Dickson has not yet decided, however, whether he will sue the plaintiffs under section 4 if he is unsuccessful in recovering fees under 42 U.S.C. § 1988(b)."). Plaintiffs respond that Dickson has not disputed that Section 4 empowers him to seek attorney's fees and costs if he is successful on any claim in this case or that he will seek attorney's fees in the event Plaintiffs are not successful in every claim. (Dkt. 57, at 18–19). Plaintiffs argue that Dickson would have to move for attorney's fees under Section 4 because "Dickson has no colorable basis for fees under Section 1988" because Plaintiffs' claim against him are well-founded. (Dkt. 57, at 19). The Court agrees.

Fees are available to defendants under 42 U.S.C § 1988 only if the court finds the action is "frivolous, unreasonable, or without foundation." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). The Court finds that Dickson has not met the "difficult standard" of showing that Plaintiffs' claims are groundless or without foundation. *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1203 (10th Cir. 2000) ("This is a difficult standard to meet, to the point that rarely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff."). Having withstood the motions to dismiss phase against all Defendants, and in the absence of any showing on Dickson's part tending to show that Plaintiffs' claims rely on "an indisputably meritless legal theory," the Court finds that Dickson will not be able to rely on Section 1988 to recover fees in this action. *See Doe v. Silsbee Indep. Sch. Dist.*, 440 F. App'x 421, 425 (5th Cir. 2011) ("[T]he dismissal of a plaintiff's claims before they reach the jury is insufficient by itself to support a finding of frivolity.").

In any event, Dickson has demonstrated his intent to recover attorney's fees in this action, and in the absence of relief available to him under Section 1988, he will necessarily need to rely on

Section 4 in making such a request. (Dickson Decl., Dkt. 50-1, at 3) ("If I am unsuccessful in recovering fees under 42 U.S.C. § 1988(b) at the conclusion of this litigation, then I will consider at that time whether to sue the plaintiffs under section 30.022 of the Texas Civil Practice and Remedies Code, in consultation with my attorneys."). Moreover, as described above, Plaintiffs need not wait, as Dickson suggests, for him to be considered a "prevailing party" in this litigation and fail to recover fees under Section 1988 to seek a pre-enforcement remedy in this Court for Dickson's future exercise of Section 4 in this case or others. *See Susan B. Anthony List*, 573 U.S. at 160.

Next, Dickson argues that Plaintiffs lack standing to seek an injunction to prevent enforcement of S.B. 8 against parties not named in this lawsuit and in the absence of a plaintiff class, which would presumably represent every person who might be sued under S.B. 8 in the future. (Dkt. 50, at 22–24). Dickson asks the Court to dismiss Plaintiffs' claim to the extent they seek relief on behalf of those not before this Court. (Dkt. 50, at 24). The Court finds that Plaintiffs have clearly sought relief on behalf of themselves and do not purport to bring their claims on behalf of others not before this Court. (Compl., Dkt.1, at 39–47). The Court thus rejects Dickson's argument that this Court must dismiss Plaintiffs' claims on this basis. Lastly, Dickson argues that this Court has "no power to formally revoke legislation or delay its effective start date" but rather may only enjoin named defendants from enforcing the statute. (Dkt. 50, at 24–26). The Court again finds this argument perplexing given that Plaintiffs have specifically sought an injunction preventing the named defendants in this lawsuit from enforcing S.B. 8. (*See, e.g.*, Dkt. 1, at 46) (requesting that the Court issue "permanent, and if necessary, preliminary injunctive relief . . . restrain[ing] Defendant Mark Lee Dickson, his agents, servants, employees, attorneys, and any persons in active concert or participation with him, from enforcing S.B. 8 in any way."). The Court finds this argument unavailing. Accordingly, the Court finds that Dickson's motion to dismiss must be denied.

## IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Defendants' motions to dismiss, (Dkts. 48, 49, 50, 51), are **DENIED**.

**SIGNED** on August 25, 2021.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE